**FOX MOTORS, INC., and Kae Myers Motors, Inc., Plaintiffs-Appellees,**

v.

**MAZDA DISTRIBUTORS (GULF), INC., and Mazda Motors of America (Central), Inc., Defendants-Appellants.**

No. 83–2125.

United States Court of Appeals, Tenth Circuit.

Nov. 26, 1986.

Charles T. Newton, Jr. (Ann Lents, with him on the brief and Murray E. Abowitz of Abowitz & Welch, Oklahoma City, Okl., with him on the brief) of Vinson & Elkins, Houston, Tex., for defendants-appellants.

Jack N. Price, Austin, Tex. (Charles Freede, Oklahoma City, Okl., with him on the brief), for plaintiffs-appellees.

* Honorable Jim R. Carrigan, United States District Judge for the District of Colorado, sitting by designation. Honorable William E. Doyle

J. Paul McGrath, Asst. Atty. Gen. (Douglas H. Ginsburg, Deputy Asst. Atty. Gen., Barry Grossman and William J. Roberts, Attys., Dept. of Justice, Washington, D.C.), filed an amicus curiae brief, for the United States of America.

Before SEYMOUR and DOYLE, Circuit Judges, and CARRIGAN, District Judge.*

SEYMOUR, Circuit Judge.

Plaintiffs, Fox Motors, Inc. and Kae Myers Motors, Inc., two Mazda dealerships in Oklahoma, sued Mazda Motors of America, Inc. (Central) and Mazda Distributors, Inc. (Gulf) under the federal antitrust laws, 15 U.S.C. §§ 1 *et seq.* (1982), and the Automobile Dealers' Day in Court Act, *id.* §§ 1221 *et seq.*, otherwise known as the Dealers' Act. The district court directed a verdict for Central on the Dealers' Act claim. The jury found in favor of Fox and Myers on the antitrust claims against Gulf and Central, and on the Dealers' Act claim against Gulf. On appeal, both defendants contend that they were entitled to judgment as a matter of law on the antitrust claims. In addition, Gulf contends that it was entitled to judgment notwithstanding the verdict, or alternatively a new trial, on the Dealers' Act claim. We reverse on the antitrust claims and affirm the finding of Gulf's liability under the Dealers' Act. We remand for a new trial on the issue of damages.

## I.

## BACKGROUND

■ In reviewing a judgment on a jury verdict, the evidence presented at trial must be considered in the light most favorable to the prevailing party. *See Hewitt v. City of Truth or Consequences,* 758 F.2d 1375, 1377 (10th Cir.1985); *Gardner v. General Motors Corp.,* 507 F.2d 525, 527 (10th Cir.1974). The record reveals the following facts.

heard oral argument but did not participate in the final decision in this matter.

Mazda automobiles are manufactured in Japan and imported into the United States. As of May 1978, Central handled Mazda imports bound for thirty-one western and midwestern states. Central provided vehicles to Gulf, an independently owned company which in turn distributed vehicles to individual dealerships in eleven states near the Gulf of Mexico. Fox and Myers, Mazda dealers since 1972, are dealerships established and supplied by Gulf. Neither dealer carried the vehicles of competing manufacturers along with those of Mazda, although after 1973 they were free to do so.

Mazda experienced poor sales between 1974 and 1977. By 1978, the only Mazda vehicle available from distributors was a new subcompact, the GLC. Many of these cars accumulated in Gulf's inventory. A number of dealers, including Fox and Myers, became financially weakened. Nonetheless, both were initially encouraged to remain with Mazda in anticipation of new, better-selling models. Mazda's sales began improving in 1978 with the introduction of a highly successful sports car, the RX-7.

RX-7s were popular but scarce. Consequently, Central was required to allocate its supply among distributors, who were required to do the same among dealers. Gulf implemented an allocation system which provided dealers with RX-7s in proportion to the number of GLCs which each dealer had sold during previous three-month intervals. In other words, the better dealers, those who had been more successful at moving GLCs, received a greater number of RX-7s. Notably, a dealer could not obtain additional RX-7s by increasing its purchases of GLCs from Gulf; it could only get more RX-7s by *selling* GLCs. Thus, those who continued to sell more GLCs were able to purchase more of the scarce RX-7s than the less successful Mazda dealers. Under this system, Gulf was able to shift its inventory of GLCs to dealers, who were selling them at a discount.

During this period of increased sales, Gulf added a significant number of new dealers. These dealers received an initial allotment of RX-7s without regard for any initial success in marketing GLCs. This allocation system remained in effect from March 1978 until April 1979, when RX-7 sales were included in the formula for obtaining additional cars.

Gulf also instituted a policy it described as "drastic action" to upgrade or eliminate established but financially ailing dealerships. Gulf representatives attempted to convince both Fox and Myers to terminate their franchises and, in addition, threatened Myers and other dealers with termination for contemplating legal action in response to Gulf's allocation system. Gulf continued to require that Fox and Myers sell more GLCs if they wished to obtain RX-7s.

Fox and Myers brought this action for damages. The district court ultimately submitted the case to the jury on the antitrust claims: (1) that Gulf's allocation method constituted a presumptively illegal tying arrangement, and (2) that Central had conspired with Gulf to implement the system.[1] The court also submitted the contention that Gulf's conduct with respect to Fox and Myers violated the Dealers' Act. In accordance with the jury verdict in favor of Fox and Myers on these claims, the court entered a treble damage judgment of approximately $1 million for Fox and $1.4 million for Myers, plus attorney's fees and interest. The district court denied defendants' post-trial motions for judgment notwithstanding the verdict and for new trial.

On appeal, Gulf and Central argue that the district court erred in sending the tying claim to the jury under a per se instruction because the arrangement should not be characterized as a per se tie, or alternatively, because the elements of such a tie were not established as a matter of law. They

---

**1.** Plaintiffs did not ask the court to submit the antitrust claim under the Rule of Reason as an alternative theory of recovery. See app., vol. II, at 649. The district court directed a verdict for Central on the antitrust claim involving its allocation system, and plaintiffs have not appealed this decision.

also assert that the evidence of a conspiracy between them to violate the antitrust laws was insufficient to create a jury issue. Gulf contends in addition that plaintiffs' Dealers' Act claim was legally and factually insufficient, and challenges the damages awarded under that Act.

## II.

### ANTITRUST CLAIMS

■ In *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), the Supreme Court held that "[i]t is far too late in the history of our antitrust jurisprudence to question the proposition that certain tying arrangements pose an unacceptable risk of stifling competition and therefore are unreasonable 'per se.'" *Id.* at 1556. Tying arrangements pose such a risk when sellers exploit their control over one market to force buyers into accepting another product which would otherwise be purchased elsewhere. Power in one market may not be employed to impair competition on the merits with existing or potential rivals in another market, nor may purchasers be denied the freedom to select the best buy in the latter market. *Id.* at 1559–60; *see also Black Gold Ltd. v. Rockwool Industries, Inc.*, 729 F.2d 676, 684–85 (10th Cir.1984).

■ The likelihood of exploitation depends upon three elements. First, purchases of the tying product must be conditioned upon purchases of a distinct tied product. *See, e.g., Fortner Enterprises v. United States Steel Corp.*, 394 U.S. 495, 507, 89 S.Ct. 1252, 1260, 22 L.Ed.2d 495 (1969) (*Fortner I*); *Times-Picayune Publishing*

*Co. v. United States*, 345 U.S. 594, 613–14, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953). Second, a seller must possess sufficient power in the tying market to compel acceptance of the tied product. Such power exists where market share is high, *see, e.g., Times-Picayune*, 345 U.S. at 611–13, 73 S.Ct. at 881–83, or where a seller offers a unique or otherwise desirable product which competitors cannot economically offer themselves. *See Fortner I*, 394 U.S. at 504–06 & n. 2, 89 S.Ct. at 1259–60, 1259 n. 2; *see also Black Gold*, 729 F.2d at 684. *See generally* II P. Areeda & D. Turner, Antitrust Law §§ 504b, 505 (1978). Finally, a tying arrangement must foreclose to competitors of the tied product a "not insubstantial" volume of commerce. *Fortner I*, 394 U.S. at 499, 89 S.Ct. at 1256 (quoting *Northern Pac. Ry. Co. v. United States*, 365 U.S. 1, 5–6, 81 S.Ct. 435, 437–38, 5 L.Ed.2d 377 (1958)).

Fulfillment of these conditions establishes a presumption of an unlawful restraint of trade and generally warrants per se condemnation under the antitrust laws. Procompetitive benefits allegedly flowing from a challenged practice are disregarded under this approach, on the ground that per se rules are designed to avoid potentially burdensome inquiries into market conditions where the likelihood of anticompetitive conduct is sufficiently great.[2] *See Hyde*, 104 S.Ct. at 1560 n. 25; *see also Arizona v. Maricopa County Medical Society*, 457 U.S. 332, 350–51, 102 S.Ct. 2466, 2476, 73 L.Ed.2d 48 (1982). *Hyde's* reaffirmation of such strict treatment for certain tying arrangements precludes application of the Rule of Reason until the probability of anticompetitive exploitation is properly

---

**2.** The Court has recognized that tying arrangements may have procompetitive justifications which make condemnation inappropriate without considerable market analysis. *See NCAA v. Board of Regents*, 468 U.S. 85, 104 S.Ct. 2948, 2962 n. 26, 82 L.Ed.2d 70 (1984). Such market analysis, however, concerns only the elements which would establish a presumption of anticompetitive forcing. The same analysis should readily disclose cases of merely "literal" tying, *cf. Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) (literal price fixing), and other situations in which the Rule

of Reason properly applies. *Cf. AAA Liquors v. Joseph E. Seagram & Sons*, 705 F.2d 1203, 1205–07 (10th Cir.1982), *cert. denied*, 461 U.S. 919, 103 S.Ct. 1403, 77 L.Ed.2d 290 (1983) (Rule of Reason applied to vertical pricing policy absent crucial element of coercion); *Colorado Pump & Supply Co. v. Febco, Inc.*, 472 F.2d 637, 640–41 (10th Cir.) (full-line requirement challenged as tying arrangement analyzed by court in terms of elements warranting per se condemnation), *cert. denied*, 411 U.S. 987, 93 S.Ct. 2274, 36 L.Ed.2d 965 (1973).

ruled out. *See Hyde*, 104 S.Ct. at 1556–61; *see also Airweld, Inc. v. Airco, Inc.*, 742 F.2d 1184, 1189 (9th Cir.1984); *Mozart Co. v. Mercedes-Benz of North America*, 593 F.Supp. 1506, 1511 (N.D.Ca.1984).

■ The initial characterization of a restraint challenged as a tying arrangement is critical in determining whether per se condemnation is appropriate. *See* P. Areeda, The "Rule of Reason" in Antitrust Analysis: General Issues 30–32 (Federal Judicial Center 1981); *see also* VII P. Areeda, Antitrust Law § 1510C (1986). Presumptive illegality depends, most obviously, upon the existence of a genuine tying arrangement: the sale of one product conditioned upon purchases of another. *See Colorado Pump & Supply Co. v. Febco, Inc.*, 472 F.2d 637, 640 (10th Cir.), *cert. denied*, 411 U.S. 987 (1973); *see also Wolfinger v. Standard Oil Co.*, 442 F.Supp. 928, 932 (S.D.Ohio 1977).

The practice challenged in this case is unlike tying arrangements historically condemned under the antitrust laws. Gulf linked the availability of RX–7s not to purchases but to *prior sales* of GLCs. This difference makes a difference. The record discloses that Gulf succeeded in shifting its inventory of GLCs to dealers, who were selling these cars at discounts. Dealers lowered their prices to consumers in order to boost sales and thereby obtain an optimal number of RX–7s. Gulf's allocation system thus achieved the legitimate result of promoting price competition, which is decidedly not the evil associated with purchase-based tying arrangements.

■ In our view, the sales-based system of allocating RX–7s in this case simply does not imply a sufficiently great likelihood of anticompetitive effect. A purchase-based arrangement might well prompt dual dealers to accept tied vehicles at the possible expense of competing lines. *See Colorado Pump*, 472 F.2d at 641. If dealers could obtain RX–7s merely by buying GLCs, they would presumably do so to the extent that revenue from sales of the tying product compensated them for any added costs attributable to tied vehicles which could not

readily be sold. In contrast, under the system here, dealers had to depend entirely upon consumer demand for the tied product in order to obtain the tying model. Thus, the dealers could not obtain RX–7s simply by stocking GLCs at the expense of competing lines. In this case, any increase in retail purchases of GLCs followed from legitimate dealer discounts or independent market factors. Fox and Myers have not suggested that consumers could not or would not obtain the car of their choice from any dual dealer, notwithstanding that such a dealer might have had extra GLCs in stock. At best, the record suggests that consumers may have favored the GLC because of legitimate dealer discounts. Ultimate consumers made their choices free of any tie, and dealers placed their orders to manufacturers accordingly.

Moreover, the record confirms that Gulf's allocation system did not satisfy the requirements of a per se tie because it did not foreclose competing manufacturers of the GLC. Even though the RX–7 may have been sufficiently differentiated and immune from duplication to confer market power upon Gulf, the dual dealers who testified at trial made no claim that they were ever precluded from buying, or otherwise declined to buy, vehicles competitive with the GLC on account of the allocation system. The record contains no indication that the alleged tying arrangement, as distinct from consumer demand, influenced the level of dealer purchases from different manufacturers. Fox and Myers themselves sold Mazda vehicles exclusively and complained only of interference with their freedom of choice in purchasing GLCs. Yet the antitrust laws protect competition, not competitors, *Atlas Building Products Co. v. Diamond Block & Gravel Co.*, 269 F.2d 950, 954 (10th Cir.1959), and "when a purchaser is 'forced' to buy a product he would not have otherwise bought even from another seller ... there can be no adverse impact on competition because no portion of the market which would otherwise have been available ... has been foreclosed." *Hyde*, 104 S.Ct. at 1560; *see also*

*Coniglio v. Highwood Services, Inc.,* 495 F.2d 1286, 1291–92 (2d Cir.), *cert. denied,* 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974). Fox and Myers may have sacrificed revenue by investing in inventory and discounting GLC prices to increase sales. Any such burden, however, derived from engaging in competition and in no way foreclosed competing manufacturers. Therefore this sales-based allocation system cannot be characterized as a tying arrangement of the kind presumptively condemned under the antitrust laws.[3]

We conclude that the judgment in favor of Fox and Myers on the antitrust claim must be reversed.

## III.

### THE DEALERS' ACT CLAIM

Gulf asserts on appeal that Fox and Myers' Automobile Dealers' Day in Court Act theories are legally insufficient and it was therefore entitled to judgment notwithstanding the verdict. Alternatively, Gulf argues that the district court erred in denying its motion for new trial because the Dealers' Act verdict is against the weight of the evidence.

■ We do not agree that Gulf was entitled to judgment n.o.v. The Dealers' Act authorizes an automobile dealer to bring a cause of action against an automobile manufacturer and its distributor for failure "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222. The duty of good faith imposed by the Act requires that both parties to a franchise "act in a fair and equitable manner toward each other so as to guarantee the one party freedom from coercion, intimidation, or threats of coercion or intimidation from the other party." *Id.* § 1221(e). This circuit has interpreted the statutory language as requiring proof of both unfair treatment and some

measure of coercion or intimidation to support a claim. *See Howard v. Chrysler Corp.,* 705 F.2d 1285 (10th Cir.1983); *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.,* 533 F.2d 510 (10th Cir.1976). "The existence of coercion or intimidation depends upon the circumstances arising in each particular case and may be inferred from a course of conduct." H.R.Rep. No. 2850, 84th Cong., 2d Sess., *reprinted in* 1956 U.S.Code Cong. & Ad.News 4596, 4603. *See Marquis v. Chrysler Corp.,* 577 F.2d 624, 633–35 (9th Cir.1978).

■ The duty of good faith requires that manufacturers and distributors comply with the terms of their franchise agreements in a manner not calculated to force individual dealers out of business. *Junikki Imports, Inc. v. Toyota Motor Corp.,* 335 F.Supp. 593, 595 (N.D.Ill.1971); *see also Randy's Studebaker,* 533 F.2d at 516 & n. 9 (approving *Junikki* ). Withholding scarce vehicles from some dealers through a discriminatory allocation scheme, with forced termination as the intended result, is thus conduct undertaken in bad faith in violation of the Act. *Randy's Studebaker,* 533 F.2d at 516 & n. 9; *see also David R. McGeorge Car Co. v. Leyland Motor Sales, Inc.,* 504 F.2d 52, 56 (4th Cir.1974) (prohibiting discriminatory allocation to achieve wrongful result).

■ Manufacturers and distributors of course remain free to promote competition and maximize their own profits. To that end, the Act allows for the termination of inefficient dealers, the use of persuasion in seeking voluntary termination, and the addition of new dealers to exploit fully a particular market. *See Randy's Studebaker,* 533 F.2d at 515. Similarly, the allocation of scarce vehicles based upon prior sales performance is generally permissible as a legitimate means of promoting competition through efficient distribution. *See, e.g., Cecil Corley Motor Co. v. General Motors Corp.,* 380 F.Supp. 819, 840 (M.D. Tenn.1974). "[M]ere arbitrariness on the

---

**3.** Because the challenged allocation system was not unlawful under the per se rule and because plaintiffs have not challenged its legality under

the Rule or Reason, we need not consider whether the evidence of a conspiracy between defendants was sufficient.

part of a manufacturer does not constitute a violation of the federal act." *Gage v. General Motors Corp.*, 796 F.2d 345, 351 (10th Cir.1986). Allocating vehicles in a manner which expressly discriminates against a certain class of dealers, however, rises to bad faith when the facts also indicate a design to force dealer termination or achieve some other wrongful objective. See *Southern Rambler Sales, Inc. v. American Motors Corp.*, 375 F.2d 932, 935 (5th Cir.), *cert. denied*, 389 U.S. 832, 88 S.Ct. 105, 19 L.Ed.2d 92 (1967).

▪ The line between promoting competition and compelling termination is properly determined by the finder of fact in each case. *See Shor-Line Rambler, Inc. v. American Motors Sales Corp.*, 543 F.2d 601, 604 (7th Cir.1976). The jury here found that the line had been crossed. We will not reverse the denial of a new trial motion asserting insufficient evidence unless the verdict is clearly or overwhelmingly against the weight of the evidence. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1481 (10th Cir.1985).

▪ Fox and Myers contended at trial that Gulf failed to act in good faith in performing or complying with the terms of their franchise agreements. The evidence in this case adequately supports a conclusion that Gulf attempted to compel termination of the franchises through the discriminatory allocation of RX–7s. Many of Gulf's established franchises had been weakened by several years of poor sales for all dealers. With Mazda's prospects improving, Gulf's avowed policy of "drastic action" against established but financially ailing franchises suggests an intention to eliminate them in favor of new or otherwise better situated dealers. Gulf representatives made several attempts, lawful in and of themselves, to convince Fox and Myers voluntarily to terminate. The jury

could reasonably have inferred that Gulf's allocation system was designed to compel the same result, particularly since the system discriminated in at least one potentially impermissible respect. Thus, Gulf established a significant number of new franchises once the RX–7 was introduced. Unlike existing dealers, these new franchises received an allotment of RX–7s without regard for any initial success in selling GLCs. There is evidence that the appeal of RX–7s helped sales of GLCs by bringing more potential customers to the dealers' facilities. The lack of a balanced inventory severely disadvantaged established dealers in their efforts to sell GLCs and made it correspondingly more difficult to obtain RX–7s.[4]

Gulf's knowledge of these facts when deciding to link the availability of RX–7s to GLC sales for established dealers alone raises a possible inference of bad faith on its part. Gulf also threatened to terminate Myers and other dealers if they did not refrain from contemplating legal action in response to the allocation system. Gulf asserts that it discriminated to allow new dealers a fair chance to develop a sales record. Yet the same need could also be attributed to established dealers who could otherwise sell only a single model. The jury could thus have discounted Gulf's explanation in favor of the less benign intention that dealers such as Fox and Myers not survive the allocation system's implementation. We cannot say that the jury verdict against Gulf on the Dealers' Act claim is clearly against the weight of the evidence.

## IV.

## DAMAGES

▪ Although Gulf's liability was properly established under the Dealers' Act, a

---

**4.** Gulf urges that Fox and Myers remained free to market competing lines, to finance and sell additional GLC's as did more enterprising dealers, and to obtain RX–7's from fellow dealers. The decisive question, however, remains whether the discriminatory aspect of Gulf's allocation system could be viewed as a calculated attempt to compel termination. Although the availability of alternative sources of supply may bear upon whether Gulf could have reasonably expected to accomplish such a result, the record by no means eliminates the possibility of success.

new trial is required on the issue of damages. Contrary to Gulf's position, the evidence introduced by Fox and Myers was legally sufficient to support an award of damages under the Act. *See Randy's Studebaker,* 533 F.2d at 517–18. The form of the verdict, however, precludes affirmance of the amount awarded.

Fox and Myers presented a damage model based upon lost profits, which purported to represent their damages under both the antitrust laws and the Dealers' Act. In accordance with the district court's instructions, the jury returned one damage verdict for all claims. This single submission is fatally ambiguous in at least one respect. The damage model clearly attempted to compensate for a fifty percent reduction in the number of RX–7s available to Fox and Myers because of Central's allocation of vehicles to Gulf. Central was allegedly liable under a theory of conspiracy to violate the antitrust laws, yet there is no conceivable basis for imposing liability against it under the Dealers' Act. Consequently, Fox and Myers' assumption of identical damages for all claims is unfounded. Because it is impossible to determine on what basis the jury computed the damages, a new trial is required to assess damages under the Dealers' Act.

Any damage model submitted on remand may include only those losses attributable to Gulf's discriminatory allocation of vehicles. Central's actions are not at issue. Similarly, the effect of Gulf's policies and practices which are not directly related to the allocation system may not be included. Fox and Myers otherwise remain free to establish the number of RX–7s which they would have received were it not for the discrimination against established dealers.

### V.

### CONCLUSION

We have considered the other issues raised by Gulf and either are not persuaded by them or have concluded that they may not arise again on retrial of the damage issue. The judgment of the district court

imposing liability upon Central and Gulf under the antitrust laws is reversed. The judgment imposing liability upon Gulf under the Automobile Dealers' Day in Court Act is affirmed. The case is remanded for a new trial on the issue of damages only.