**OLYMPIC CHEVROLET, INC., Plaintiff,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

No. 95 C 1532.

United States District Court, N.D. Illinois, Eastern Division.

March 28, 1997.

Donald Cahill Shine, Gregory Canard Ward, Nisen & Elliott, Chicago, IL, for plaintiff.

David J. Zott, Richard Cartier Godfrey, Andrew Baker Bloomer, Kirkland & Ellis, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

BUCKLU, District Judge.

The plaintiff, Olympic Chevrolet, Inc. ("Olympic"), has sued the defendant, General Motors Corporation ("GM/Chevrolet"), under a variety of theories. GM/Chevrolet has moved for summary judgment. For the following reasons, the motion is granted.

### I.

GM/Chevrolet manufactures Chevrolet motor vehicles and sells them to independent dealers like Olympic. On January 3, 1992, GM/Chevrolet and Olympic signed a Dealer Sales and Service Agreement ("Dealer Agreement"). Unhappy with the vehicles it has received from GM/Chevrolet under the Agreement, Olympic brought the present suit. Olympic seeks specific performance (Count I) and declaratory judgment (Count IV), and claims breach of the Dealer Agreement (Count V) and violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois Consumer Fraud Act") (Count VI), 815 ILCS 505/1 et seq. (1993), the Illinois Motor Vehicle Franchise Act ("Illinois Franchise Act") (Counts II and III), 815 ILCS 710/4 et seq. (Supp.1996), and the federal Automobile Dealers Day in Court Act. 15 U.S.C. § 1221 et seq. GM/Chevrolet has moved for summary judgment.

### II.

#### Illinois Consumer Fraud Act

■ In Count VI, Olympic claims that GM/Chevrolet violated the Illinois Consumer Fraud Act. 815 ILCS 505/1 et seq. Olympic argues that it entered into the Dealer Agreement because of various misrepresentations by GM/Chevrolet. Specifically, Olympic points to the following statements allegedly made by William Stacy, GM/Chevrolet's Chicago Zone Manager, to Michael Christopoulos, Olympic's president, in the course of conversations prior to Olympic's filing the application to become a GM/Chevrolet dealer: (1) Olympic's initial inventory would be at least 120 new vehicles, (2) GM/Chevrolet would provide sufficient vehicles for Olympic to maintain 120 new vehicles on the ground, (3) Olympic would be able eventually to develop an inventory of 200 vehicles, and (4) Olympic's planning potential, i.e., how much the dealership was expected to sell annually, was between 800 and 1000 vehicles.[1]

It is undisputed that after these conversations, Mr. Christopoulos submitted his dealer application to GM/Chevrolet. GM/Chevrolet rejected the application in February 1991, in part because the parties disagreed about the dealership's location. GM/Chevrolet deemed Mr. Christopoulos' proposed location to be too close to another GM/Chevrolet dealer, and Mr. Christopoulos refused to consider moving the dealership to a different location within three to four years. When GM/Chevrolet refused to rethink its decision, Mr. Christopoulos filed suit in state court. GM/Chevrolet lost and subsequently signed the Dealer Agreement on January 3, 1992.

■ Under the Illinois Consumer Fraud Act, Olympic must prove (1) a misrepresentation or concealment (2) of a material fact, (3) made with the intent to induce reliance and (4) in a course of conduct involving trade or commerce. *Mackinac v. Arcadia Nat'l Life Ins. Co.*, 271 Ill.App.3d 138, 648 N.E.2d 237, 239, 207 Ill.Dec. 781, 783 (1995). Intent to induce reliance can be shown by circumstantial evidence. *Totz v. Continental Du Page Acura*, 236 Ill.App.3d 891, 602 N.E.2d 1374, 1382, 177 Ill.Dec. 202, 210 (1992).

■ Olympic argues that GM/Chevrolet intended that Olympic rely upon Mr. Stacy's statements. Had the parties signed the Dealer Agreement immediately after the negotiations between Messrs. Stacy and Christopoulos, a factfinder might conclude that Mr. Stacy's statements were intended to

---

1. The plaintiff also alludes to misrepresentations made after the contract was signed. "Claims made pursuant to the Illinois Consumer Fraud Act ... must state the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated." *Gallagher Corp. v. Massachusetts Mut. Life Ins. Co.*, 940 F.Supp. 176, 180 (N.D.Ill.1996) (quotation omitted). Olympic does not provide evidence of misrepresentations made after the parties entered into the Dealer Agreement which are sufficiently specific to warrant consideration here.

induce Olympic to enter into the dealership relationship in reliance on the representations. Here, however, after Mr. Stacy made the statements, GM/Chevrolet vigorously resisted granting the franchise to Mr. Christopoulos and signed the Dealer Agreement only after a court order forced it to do so. A reasonable factfinder could not conclude that GM/Chevrolet intended Olympic to rely on Mr. Stacy's statements when GM/Chevrolet clearly did not want to begin a franchise relationship with Olympic. Thus, GM/Chevrolet is entitled to summary judgment on the Illinois Consumer Fraud Act Count.

### Automobile Dealers Day in Court Act

■■■ In Count VII, Olympic alleges that GM/Chevrolet violated the Automobile Dealers Day in Court Act. 15 U.S.C. § 1221 *et seq.* The Act allows automobile dealers to sue a manufacturer for failing to act in good faith. *Ed Houser Enters. v. General Motors Corp.*, 595 F.2d 366, 369 (7th Cir.1978). Lack of good faith under the Act means "coercion, intimidation, and threats thereof." Id. at 369. Manipulation of the dealer's inventory may constitute coercion when the facts suggest an intent to drive the dealer out of business. *Hall v. Ford Motor Co.*, No. 94–3885, 1995 WL 619972, at **2 (6th Cir. Oct. 20, 1995) (citing, *inter alia, Junikki Imports, Inc. v. Toyota Motor Co.*, 335 F.Supp. 593, 595 (N.D.Ill.1971)); *see also Ed Houser Enters.*, 595 F.2d at 371 ("absent facts showing coercion, discriminatory allocation [of vehicles among different dealerships] is not *per se* cognizable under the Act").

■■■ Olympic argues that GM/Chevrolet's failure to supply it with vehicles was coercion because it sought to drive Olympic out of business or to force it to move. GM/Chevrolet counters that Olympic has not raised a genuine issue of material fact as to such motivation. It is undisputed that GM/Chevrolet preferred to locate Mr. Christopoulos' dealership in Elmwood Park, Illinois, rather than Chicago. GM/Chevrolet rejected Mr. Christopoulos' dealership application because he refused to consider relocating the dealership to Elmwood Park in a few years.

GM/Chevrolet fought and lost a lawsuit to resist Mr. Christopoulos' efforts to establish Olympic in Chicago. On April 8, 1992, GM/Chevrolet's General Sales Manager, R.W. Starr, penned an internal memorandum in which he stated that "[w]e need to make sure that our legal people understand where we are going on this. If we are going to continue to let this guy[, Mr. Christopoulos,] push us, we are in deep trouble. We need to stop it and we need to stop it now."

*Fox Motors, Inc. v. Mazda Distribs. (Gulf), Inc.*, 806 F.2d 953 (10th Cir.1986), is instructive. In that case, the defendant had an express policy of eliminating established but financially troubled franchises. The defendant made several attempts to convince the plaintiff to terminate the franchise agreement voluntarily. The defendant adopted a discriminatory policy of vehicle distribution, which preferred new dealerships and disfavored the plaintiff, an established concern. The distribution system severely disadvantaged the plaintiff in terms of the most popular models. Affirming the jury's finding of liability under the Automobile Dealers Day in Court Act, the court concluded that "[t]he jury could reasonably have inferred that [the defendant's] allocation system was designed to compel" the plaintiff to terminate the franchise relationship. Id. at 960.

In contrast to *Fox Motors*, there is no evidence that, after it lost the lawsuit, GM/Chevrolet continued to prompt Olympic to move to Elmwood Park. Surely, if the defendant had done so, Olympic's personnel could have proffered written or testified about oral communications to that effect. In addition, GM/Chevrolet closed the Elmwood Park location in November 1994. Unlike the plaintiff in *Fox Motors*, Olympic presents no evidence that GM/Chevrolet treated other dealerships differently. Indeed, there is evidence to the contrary from GM/Chevrolet and from Olympic.

The only evidence that GM/Chevrolet intended to put Olympic out of business is Mr. Starr's memorandum, which Olympic characterizes as expressing the sentiment that Olympic had to be stopped.[2] However,

---

**2.** When asked in his deposition to explain the

memorandum, Mr. Starr stated that by "deep

Olympic has presented no evidence of economic distress. It is undisputed that Olympic has realized a profit every year since it started operations. Neither has Olympic presented evidence of discrimination between dealers. Thus, Olympic has not created a genuine issue of material fact as to coercion, and GM/Chevrolet is entitled to summary judgment on the Automobile Dealers Day in Court Act count.

### Contractual Claims

■ Under Illinois law,[3] the plaintiff proves a breach of contract by establishing 1) a valid and enforceable contract; 2) performance of contractual duties by the plaintiff; 3) a breach of contractual duties by the defendant; and 4) resulting damages to the plaintiff. *Hickox v. Bell*, 195 Ill.App.3d 976, 552 N.E.2d 1133, 1143, 142 Ill.Dec. 392, 402 (1990). Olympic's variously phrased contractual claims—specific performance (Count I), declaratory judgment (Count IV), and breach of contract (Count V)—essentially complain that GM/Chevrolet breached its duty under the Dealer Agreement to supply Olympic with vehicles. Olympic believes that it is entitled to a "reasonable" quantity and mix of vehicles. It argues that a jury must determine what this mix is. GM/Chevrolet's position is that the Dealer Agreement vests it with absolute discretion as to which vehicles to supply and how many.

The primary objective in construing a contract is to "give effect to the parties' intent." *Home Ins. Co. v. Chicago & N.W. Transp. Co.*, 56 F.3d 763, 767 (7th Cir.1995). It is for the court to determine whether the contract terms are ambiguous. *Meyer v. Marilyn Miglin, Inc.*, 273 Ill.App.3d 882, 652 N.E.2d 1233, 1238, 210 Ill.Dec. 257, 262 (1995). "If the contract terms are unambiguous, the parties' intent must be ascertained exclusively

from the express language of the contract." Id. "[A] contract must be interpreted as a whole, giving meaning and effect to each provision." *CSX Transp. v. Chicago & N.W. Transp. Co.*, 62 F.3d 185, 190 (7th Cir.1995).

Under Article 6.4.1 of the Dealer Agreement, "recogniz[ing] that customers expect Dealer to have a reasonable quantity and variety of current model Motor Vehicles in inventory," GM/Chevrolet "agrees to make available, subject to Article 6.1, a mix of models and series of Motor Vehicles identified in the Motor Vehicle Addendum in quantities adequate to enable Dealer to fulfill its obligations in its Area of Primary Responsibility." Article 6.1 provides that GM/Chevrolet

will endeavor to distribute new Motor Vehicles among its dealers in a fair and equitable manner. Many factors affect the availability and distribution of Motor Vehicles to dealers, including component availability and production capacity, sales potential in Dealer's Area of Primary Responsibility, varying consumer demand, weather and transportation conditions, governmental regulations, and other conditions beyond the control of [GM/Chevrolet]. [GM/Chevrolet] reserves to itself discretion in accepting orders and distributing Motor Vehicles, and its judgments and decisions are final.

■ Olympic disagrees that GM/Chevrolet possesses absolute discretion to determine how many and which vehicles Olympic will receive. Referring to the factors listed in Article 6.1, Olympic contends that GM/Chevrolet may exercise discretion only when supply is impacted by circumstances beyond its control. The contract does not support this interpretation. While the listed factors provide an explanation for GM/Chevrolet's reservation of authority, the last sentence ex-

---

trouble" he meant that Mr. Christopoulos' litigious approach to the franchise relationship was setting a bad example for other dealers, and that by "need to stop it and we need to stop it now," he meant that GM/Chevrolet needed to find out what the problems were, correct them, and stop wasting time with the antagonistic approach. If the memorandum were determinative, of course it would be up to a factfinder to decide whether to credit the explanation.

**3.** Article 17.12 of the parties' agreement provides that the Dealer Agreement "is governed by the laws of the State of Michigan." Olympic relies exclusively on Illinois law. GM/Chevrolet utilizes Michigan and Illinois law and states that there is no material difference between the two. Since both parties have relied on Illinois law I will assume they have waived any difference between the law of the two states.

pressly reserves to GM/Chevrolet discretion as to judgments about distribution.

■ Olympic also relies on the Preamble to the Dealer Agreement, which states that GM/Chevrolet "will provide superior quality, competitively priced cars and trucks in a quantity and model mix sufficient to allow the dealer to competitively sell against any non-[GM/Chevrolet] retail company in the dealer's area of primary responsibility." The Preamble includes a "Mutual Pledge" whereby "[i]t is understood that neither party can obtain ... mutual objectives without the support of the other. Therefore, both parties pledge to work towards the support of each other to attain our mutual objectives of leadership in vehicle sales and customer satisfaction." The Preamble is consistent with the other clauses in the Dealer Agreement. It echoes the language in Article 6.4.1, whereby, subject to its discretion, GM/Chevrolet promises to provide "a mix of models and series of Motor Vehicles ... in quantities adequate to enable Dealer to fulfill its obligations in its Area of Primary Responsibility." However, "introductory language or recitals are not binding obligations unless so referred to in the operative portion of the instrument." *Atlantic Mut. Ins. v. Metron Eng'g,* 83 F.3d 897, 899 (7th Cir.1996) (quotation omitted). Olympic has not pointed to any portion of the Dealer Agreement which explicitly incorporates the Preamble.

Olympic next points to the purpose of the Dealer Agreement which is "[t]o promote a relationship between [GM/Chevrolet] and its Dealers which encourages and facilitates cooperation and mutual effort to satisfy customers, and permits [GM/Chevrolet] and its dealers to fully realize their opportunities for business success." This language does not contradict or render ambiguous the language of Articles 6.1 and 6.4.1. The Dealer Agreement is unambiguous. Olympic is entitled

only to those vehicles which GM/Chevrolet decides to provide it in its discretion.

■ Olympic argues that Mr. Christopoulos contemplated a different construction of the term discretion. Since the Dealer Agreement is unambiguous, parole evidence is inadmissible. *Meyer,* 210 Ill.Dec. at 262, 652 N.E.2d at 1238. Additionally, by the terms of Article 17.11, the Dealer Agreement is the complete and exclusive expression of the parties' contractual relationship. Parole evidence cannot therefore be used to vary the meaning of the Dealer Agreement's terms. *Chicago White Metal Casting, Inc. v. Treiber,* 162 Ill.App.3d 562, 517 N.E.2d 7, 12, 115 Ill.Dec. 42, 47 (1987). Finally, Mr. Christopoulos, Kevin Koch, Olympic's Secretary and Treasurer, and Larry Mitch, Olympic's store manager, always understood that GM/Chevrolet would have the last word on what vehicles Olympic would receive and how many.[4]

■ Olympic also contends that if GM/Chevrolet is vested with absolute discretion, the Dealer Agreement is illusory. However, discretionary contract terms are commonplace and do not render the contract illusory. *See Continental Mobile Tel. Co. v. Chicago SMSA Ltd.,* 225 Ill.App.3d 317, 587 N.E.2d 1169, 1174, 167 Ill.Dec. 554, 559 (1992).

■ Furthermore, GM/Chevrolet's discretionary authority is not in fact absolute. It is limited by the duty of good faith which is inherent in every Illinois contract. *Corrigan v. Cactus Int'l Trading Co.,* 771 F.Supp. 262, 265 (N.D.Ill.1991). Good faith means that GM/Chevrolet must "exercise ... discretion reasonably and ... not arbitrarily or capriciously." *Foster Enters., Inc. v. Germania Fed. Savs. & Loan Ass'n,* 97 Ill.App.3d 22, 421 N.E.2d 1375, 1381, 52 Ill.Dec. 303, 309 (1981).

---

4. Mr. Christopoulos affirms that had he known that GM/Chevrolet would exercise absolute discretion, he would not have entered into the Dealer Agreement. However, in his deposition, he testified as follows:

> Q: And you always understood that Chevrolet pretty much could do whatever it wants to do with regard to developing the distribution system, right?

> A: Yes.

Mr. Christopoulos cannot create a genuine issue of material fact by contradicting his deposition with a later affidavit. *Bank of Ill. v. Allied Signal Safety Restraint Sys.,* 75 F.3d 1162, 1168–69 (7th Cir.1996).

Olympic argues that whether GM/Chevrolet acted reasonably and in good faith is a question of fact. However, as the party with the burden of proof, to withstand GM/Chevrolet's motion for summary judgment, Olympic must come forward with specific evidence showing that there is sufficient evidence for a jury to find that GM/Chevrolet abused its discretion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 669–71 (7th Cir.1987).

▪ GM/Chevrolet offers the following description of the distribution system. The first step is for the dealer to submit an order for a vehicle he desires to the GM/Chevrolet's "order bank." The second step is the calculation of "preference guide." GM/Chevrolet inputs the following factors into a formula: (1) the dealer's sales rate by vehicle line as compared to all other comparable dealers in the nation; (2) the number of vehicles in a product line already available to this dealership; and (3) the number of new vehicles by product line to be distributed. The third step is known as "mechanical preferencing," which matches "preference guide" and the dealer's orders in the "order bank," to come up with the dealer's weekly allocation.

Olympic insists that there are many exceptions to the system and much discretion is exercised by the GM/Chevrolet personnel. Messrs. Christopoulos, Mitch, and Koch admitted that GM/Chevrolet used the same three factors to figure out "preference guide" as set forth by the defendant—sales rate, availability, and the number of vehicles to be distributed. Olympic argues, however, that a dealer's weekly allocation could be impacted by considerations in addition to those set forth by GM/Chevrolet.

Henry Barrick, whom GM/Chevrolet designated as its witness with respect to the distribution system, testified that vehicles are sometimes "held back" from dealer allocations for certain "special allocations," such as allocations to new dealerships.[5] Mr. Barrick also testified that a dealer's orders could be "dumped" or "forced" into the distribution system, bypassing the system's constraints. The section of the Dealer Distribution Manual dealing with the preferencing process states that

> [t]he first step in Preferencing, the computer matching or Mechanical Preferencing ..., does not replace good business judgment. That comes in the second step, when the Regional Distribution Department reviews the results of the mechanical preferencing.

> The Regional Distribution Department, in conjunction with the District Sales Manager, review the results of the Mechanical Preference and have the opportunity to make substitutions within a Zone's totals.

Even if additional factors could theoretically impact a dealer's allocation, they did not impact Olympic's. Mr. Koch testified that he knew of no instances in which Olympic had orders in its order bank for a particular vehicle line and generated guide for a particular vehicle yet was not allocated the vehicle. Mr. Christopoulos also testified that he was not aware of any such instances. In its Response to GM/Chevrolet's 12(M) Statement, Olympic stated that it received vehicles for which it had orders exactly matching GM's production constraints. Thus any dispute regarding the specifics of how "mechanical preferencing" may function is immaterial. *Whetstine v. Gates Rubber Co.*, 895 F.2d 388, 392 (7th Cir.1990).

Olympic's complaint boils down to GM/Chevrolet's response to Olympic's requests for vehicles outside the "mechanical preferencing" process. After "mechanical preferencing" is completed, there remain "unmatched" vehicles because the dealers do not order all the vehicles they generate according to the "preference guide" calculation. The left-over product is known as "open guide." In the case of Olympic, Mr. Stacy,

5. GM/Chevrolet points out that Mr. Barrick also testified that the vehicles are "held out" nationwide, suggesting that the dealers are uniformly affected. Nevertheless, the very fact of "holding out" (or "holding back") vehicles supports Olympic's contention that additional factors could impact weekly allocations.

GM/Chevrolet's Chicago Zone Manager, and Paul Simison, GM/Chevrolet's District Service Manager (DSM), made recommendations regarding what "open guide" would be supplied to Olympic. Gloria Johnson, GM/Chevrolet's Regional Distribution Manager, normally approved DSM's recommendations. The mere fact that the above individuals possessed discretion with respect to the assignment of "open guide" is not probative of whether that discretion was abused in the case of Olympic. *See Cabriolet Porsche Audi Inc. v. American Honda Motor Co.*, 773 F.2d 1193, 1206 (11th Cir.1985) ("[a]n allocation system is not unreasonable simply because it is possible to subvert it").

Olympic argues that GM/Chevrolet ignored Olympic's requests for vehicles. In support of this proposition, Olympic offers testimony of Gary Beebe,[6] in which he indicated that Mr. Mitch, Olympic's store manager, requested additional vehicles in the first quarter of 1992, and that the models he requested were not available from the "open guide." Mr. Beebe stated that Mr. Mitch turned down certain models which he could have had. Moreover, Mr. Beebe alerted his superiors to Olympic's requests.

Olympic also argues that in 1992, it requested but was not supplied with additional Suburban and Blazer models, but Olympic did not dispute GM/Chevrolet's statement that in that year, it provided Olympic with 15 additional Blazers and one additional Suburban.

Olympic also states that GM/Chevrolet cancelled Olympic's 1992 orders. The record reveals a much less dramatic reality. According to Mr. Stacy, if an order is placed late in the year, as was the case with the order at issue here, it is cancelled automatically because GM/Chevrolet does not build last year's models. Although Olympic says that Mr. Stacy was unwilling to testify that the orders were placed too late and that was the reason for cancellation, Mr. Stacy testi-

fied only that he did not have the orders in front of him. Olympic, with its burden of proof, should have shown him the orders and asked the question again. It has not provided any evidence to counter Mr. Stacy's testimony about the general reason an order is cancelled, or that the Olympic orders in question were placed late in the year, nor any evidence that the orders were cancelled for any reason other than that they were tendered too late for production.

Finally, Olympic claims that Ms. Johnson took no action with respect to Olympic's problems and was never asked by anyone at GM/Chevrolet to assist Olympic. The record shows that Ms. Johnson became Regional Distribution Manager in April 1993. During that month, she assisted Olympic in receiving additional vehicles through the so-called "Sobrero allocation." In February 1994, John Roberts, GM/Chevrolet's Chicago Zone Manager, informed Ms. Johnson about Mr. Christopoulos' letter to Michael Losh, GM/Chevrolet's Group Executive and Vice President of North American Sales, Service and Marketing, in which Mr. Christopoulos complained about inventory shortages. She did not take any action in regard to the letter. Later in the year, Mr. Roberts brought Olympic's inventory concerns to Ms. Johnson's attention. After checking with David Canham, GM/Chevrolet's Director of Distribution, Ms. Johnson told Mr. Roberts that no extra product was available either for Olympic or for any other dealership. Sometime in 1994, Mr. Simison also conveyed Olympic's complaints about inventory to Ms. Johnson. Ms. Johnson testified that, since 1994 was a year of many shortages and numerous dealers were concerned about their inventory levels,[7] without conducting any research, she told Mr. Simison that no extra allocations were available.

From January 6, 1992 to December 25, 1995, Olympic received approximately 803 new vehicles from the "open guide."[8] Signif-

---

6. Olympic claims that Mr. Beebe was effectively GM/Chevrolet's District Service Manager with responsibility for Olympic. GM/Chevrolet disagrees but does not provide Mr. Beebe's title.

7. It is undisputed that Olympic's personnel knew of the shortages and their effect on all dealerships.

8. In its 12(N) response, Olympic admitted that on limited and sporadic occasions it received

icantly, Olympic has offered no evidence that GM/Chevrolet responded differently to other dealerships' complaints about lack of inventory or that it supplied them with relatively more "open guide" vehicles.

 The other evidence relied on by Olympic to show bad faith on the part of GM/Chevrolet is the defendant's alleged misrepresentation that Olympic's opening inventory would be 120 vehicles. Although oral representations cannot vary the terms of the Dealer Agreement, they may be relevant to the issue of good faith. *Schott Motorcycle Supply, Inc. v. American Honda Motor Co.,* 976 F.2d 58, 63 (1st Cir.1992); 810 ILCS 5/2–103 (good faith is honesty in fact). It is undisputed that from January to September 1992, Olympic maintained a self-imposed inventory limit of 100 vehicles. It is further undisputed that, pursuant to that limit, Olympic's initial vehicle order, placed in January 1992, was for only 70 vehicles. Thus, the size of Olympic's initial inventory was of the plaintiff's making.

Olympic also accuses GM/Chevrolet of depressing its vehicle needs. Olympic argues that had its vehicle needs been greater, it would have placed more orders and received more vehicles through the "mechanical preferencing" process. Olympic points to GM/Chevrolet's admission that Olympic did not receive an opening inventory, and argues that GM/Chevrolet did not provide signage until late May 1992. Olympic's theory is that the lack of signage resulted in lower demand, which resulted in lower orders and correspondingly lower inventory. Low inventory, also caused by GM/Chevrolet's failure to supply Olympic's opening inventory, led to lower sales, which affected vehicle allocations by GM/Chevrolet.

It is undisputed that Olympic ordered its initial inventory of 70 vehicles on January 29, 1992. GM/Chevrolet admits that in an April 28, 1992 memorandum, Harry Stone, GM/Chevrolet's Account Manager, agreed that as of that date, Olympic had not yet received all of the new vehicles it initially ordered. In his deposition, however, Mr. Mitch admitted that as of May 4, 1992, GM/Chevrolet had placed all but seven vehicles in Olympic's order bank. GM/Chevrolet agrees that Olympic did not receive its signage until late May 1992 and could not hold itself out to the public as a GM/Chevrolet dealer until that date.

From this evidence, a reasonable factfinder could not conclude that a causal relationship existed between the absence of signage and incomplete initial inventory, on the one hand, and Olympic's ordering patterns, on the other. If there were such a relationship, Olympic would have eliminated its inventory restriction around May 1992, when the signage and the initial inventory problems were rectified. But Olympic did not rescind its 100 vehicle limit until September 1992. Beyond that, Olympic continued to order fewer vehicles than it was entitled to until December 1995.[9] Olympic offers no contemporaneous statements by its personnel to GM/Chevrolet, attributing Olympic's low orders to the absence of signage or incomplete initial inventory. Moreover, Olympic's evidence is simply too sparse to enable a jury to find that GM/Chevrolet's timetable with respect to signage and initial inventory was unreasonable or suspect. For example, Olympic has not offered evidence as to any understanding

"open guide." This response is not supported by any reference to the record. Therefore, GM/Chevrolet's statement is admitted. N.D. Local R. 12(N)(3).

9. GM/Chevrolet points out that, as of December 1995, Olympic had ordered 373 fewer vehicles than it had generated according to the "preference guide" calculation and to which it was entitled. In response, Olympic generally points to its 12(N) Statement. Olympic's 12(N) Statement consists of 47 paragraphs; the court cannot be expected to figure out which are relevant here. *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991) ("[j]udges are not like pigs, hunt-

ing for truffles buried in briefs"); N.D. Local R. 12(N)(3) (requiring specific references to the record). Olympic also contends that its ordering pattern was affected by lack of signage and incomplete initial inventory. This justification is not plausible after May 1992, when both problems were admittedly rectified. Finally, Olympic argues that it was not required to order a full range of vehicles and exercised sound business judgement when ordering. Conceding the validity of this argument, it does not contradict the evidence presented by GM/Chevrolet that Olympic was ordering fewer vehicles than it was entitled to under the distribution system.

between the parties that Olympic was to have received its signs and inventory significantly earlier.[10]

In conclusion, the Dealer Agreement vests GM/Chevrolet with discretion as to the number and type of vehicles to which Olympic is entitled. Olympic has not presented sufficient evidence to enable a factfinder to conclude that GM/Chevrolet exercised its decision-making authority in breach of the Dealer Agreement when implementing its distribution system, providing Olympic's initial inventory, or delivering signage.[11] Thus, GM/Chevrolet's summary judgment motion is granted with respect to Counts I, IV, and V.

### Illinois Franchise Act

■ In Count II, Olympic alleges that GM/Chevrolet violated Sections 4(b) and 4(d)(1) of the Illinois Franchise Act, which prohibit "any action with respect to a franchise which is arbitrary, in bad faith or unconscionable," 815 ILCS 710/4(b), and any "plan or system for the allocation and distribution of new motor vehicles to. dealers which is arbitrary or capricious." 815 ILCS 710/4(d)(1).

The Illinois Franchise Act does not define the terms "arbitrary," "capricious," "bad faith," or "unconscionable." However, courts interpreting similar vehicle franchise laws in other states have defined these terms according to their generally accepted synonymous meanings. *Schott Motorcycle Supply, Inc.,* 976 F.2d at 62–63. Thus, for example, "arbitrary" means "selected at random and without reason," while "bad faith" means without "honesty in fact and [not in] the observation of reasonable commercial standards of fair dealing in the trade." Id. at 63. Having failed to raise a genuine issue of material fact with respect to lack of good faith or unreasonableness on behalf of GM/Chevrolet in its contractual claims, Olympic cannot withstand GM/Chevrolet's motion for summary judgment on Count II.

Olympic's Count III alleges that GM/Chevrolet violated Section 4(d)(3) of the Illinois Franchise Act. Under that section, a manufacturer cannot

refuse to deliver in reasonable quantities and within a reasonable time after receipt of dealer's order, to any motor vehicle dealer having a franchise or selling agreement for the retail sale of new motor vehicles sold or distributed by such manufacturer ... any such motor vehicles as are covered by such franchise or selling agreement *specifically* publicly advertised in the State by such manufacturer ... to be available for *immediate* delivery.

815 ILCS 710/4(d)(3) (emphases added).

■ Robert Whisner, GM/Chevrolet's designated deponent on the issue of advertising, testified that GM/Chevrolet never specifically advertised in Illinois that any of *its* vehicles are available for immediate delivery. Olympic points out that Mr. Whisner also testified that the aim of GM/Chevrolet's multimedia advertising is to create customer awareness of GM/Chevrolet products when people are in the market to purchase a car; that GM/Chevrolet does not advertise that its vehicles are not available for immediate delivery; and that the GM/Chevrolet's legal staff does not monitor the advertising content of independent dealers. Olympic argues that a reasonable factfinder could conclude that GM/Chevrolet's advertising gives the impression that all of its vehicles are available for immediate delivery. However, Olympic must create a factual issue that GM/Chevrolet "specifically.. advertised" that the vehicles it furnished to Olympic were "available for immediate delivery." 815 ILCS 710/4(d)(3). This Olympic has not done. Therefore, GM/Chevrolet's motion for summary judgment is granted with respect to Count III. *Cemar Inc. v. Nissan Motor Corp.,* 713 F.Supp. 725, 736 (D.Del.1989) (statute substantially identical to Illinois').

---

10. Messrs. Beebe's and Stacy's statements that signage was installed later than expected are insufficient.

11. To the extent that Olympic seeks to show bad faith by invoking GM/Chevrolet's motivation to

put the plaintiff out of business or to force it to move, I have concluded in the discussion of Olympic's claim under the Automobile Dealers Day in Court Act that Olympic's evidence is insufficient to support this contention.

## Conclusion

For the reasons stated above, the defendant's summary judgment motion is granted.