**WOOTTON ENTERPRISES, INC., Plaintiff**

v.

**SUBARU OF AMERICA, INC., Defendant**

**No. CIV AMD 99–810.**

United States District Court, D. Maryland.

Feb. 28, 2001.

Lewis J. Baker, Lewis I. Askew, Jr., Benjamin T. Riddles, Watt, Tieder, Hoffar & Fitzgerald, L.L.P., Akin Alcitepe, Law Office, McLean, VA, for plaintiff.

Jeffrey D. Herschman, Kathleen A. Ellis, Piper, Marbury, Rudnick & Wolfe, Baltimore, MD, for defendant.

## MEMORANDUM

DAVIS, District Judge.

Plaintiff, Wootton Enterprises, Inc. ("Wootton"), a Maryland automobile dealership, has brought state common law breach of contract claims and federal and state statutory claims against Subaru of America, Inc. ("Subaru"), a new automobile distributor.[1] In consequence of proceedings related to prior motions to dismiss filed in this case, and by orders entered on August 16, 1999, and March 17, 2000, I dismissed the great bulk of Wootton's myriad claims as legally insufficient. In particular, I concluded that, as a matter of law, a broad release of claims contained within the most recent franchise agreement between the parties was valid and enforceable. Accordingly, I concluded that Wootton could pursue only those claims not encompassed by the release, i.e., those claims arising from Subaru's acts and omissions occurring after the March 1, 1998, effective date of the 1998 franchise agreement.

Discovery has now concluded. Pending before the court is Subaru's motion for summary judgment as to all remaining claims. The parties presented oral argument at a hearing held on February 1, 2001, during which Wootton was heard at length. Thereafter, I allowed the parties to submit supplemental memoranda. Now, after the creation of a voluminous documentary record and three oral hear-

---

1. Wootton's 51 page, 149 paragraph second amended complaint contained nine separately stated counts, most with "sub-counts" and "sub-sub-counts." In the vast majority of the reported cases of this sort, automobile franchisees rely most heavily upon the federal statute, the Automobile Dealer's Day in Court Act, 15 U.S.C. §§ 1221–25, which imposes on franchisors duties, and, concomitantly, provides protection to franchisees, beyond those provided by mere breach of contract claims. Nevertheless, Wootton has most vigorously prosecuted its ostensible breach of contract claims and I shall consider those claims first.

ings, I remain unpersuaded of the legal efficacy of Wootton's claims. Simply put, the record before me does not remotely support Wootton's claims. Thus, for the reasons set forth herein, the motion for summary judgment shall be granted and judgment entered in favor of defendant.

## I

Wootton is a family-owned enterprise that has operated as an automobile dealer since 1969. Between 1977 and December 2000, the parties (or their predecessors-in-interest) were signatories to a series of franchise agreements pursuant to which Wootton operated a Subaru retail outlet in Pasadena, Maryland. Wootton was within Subaru's Southeast Region, and was among the 11 dealers located in Southeast Region District 10. In or about 1995, the manufacturer of Subarus essentially abandoned its existing market niche to enter the all-wheel-drive market. At around this time, Subaru sales experienced a nationwide decline, and Subaru modified its marketing plans to reflect this manufacturing shift.

Wootton's broad theory of this case is that starting in or about 1995, Subaru executives put into effect a scheme designed either (1) to coerce Wootton into voluntarily relinquishing its Subaru franchise or (2) to erect impediments to Wootton's performance of its contractual obli-

gations, so as to create "reasonable cause" to terminate Wootton's franchise pursuant to the terms of the franchise agreement. The centerpiece of this theory, and the principal item of proof relied on by Wootton for its theory of an insidious scheme designed to deprive it of the Subaru franchise, was said by Wootton to be Subaru's non-disclosure of the existence of market study reports prepared in 1995 and 1999 which indicate, *inter alia,* that the Pasadena, Maryland, sales outlet (i.e., Wootton's facility) should ideally be relocated to Glen Burnie, Maryland, a short distance away from Wootton's location.[2] In a similar vein, Wootton argued vigorously that evidence of this scheme could be found in the comments of a Subaru employee to "Automotive News," a trade publication, indicating that, from the perspective of Subaru's national marketing plan, Subaru very much wanted to reduce the number of its dealerships, either through involuntary termination, repurchase or by altering dealer incentives, based on dealership size and success, to effect voluntary terminations. Wootton also characterizes comments of Subaru officials that Subaru had created too many dealerships as "admissions" regarding Subaru's malevolent intentions towards Wootton. Wootton also cites comments from Subaru management indicating that Wootton's performance was not optimal (which it was not, as shown

---

**2.** The market studies are elaborate reports produced by Subaru's Marketing Department that make recommendations concerning dealership location and provide demographic data on potential car buyers. For example, the reports state that Subaru should target households with an income of at least $35,000 per year. The market studies discuss where the bulk of those families reside and where there exists the greatest likelihood of growth for those households, and similar demographic data and projections. The 1995 study recommended that the Pasadena sales outlet relocate to Glen Burnie and that the Cockeysville and Westminster sales outlets be consolidat-

ed. The 1999 study recommended that the Baltimore, Pasadena and Westminster sites close or consolidate.

Notwithstanding the fact that the summary judgment record contains not even a scintilla of evidence' that Subaru ever implemented or attempted to implement the sundry recommendations of the market studies, Wootton interprets the recommendation to relocate the Pasadena sales outlet to Glen Burnie as substantial evidence of Subaru's effort to take away Wootton's dealership. I reject Wootton's spin on this evidence for the reasons discussed at length in text.

even by Wootton's own contemporaneous statements) and periodic requests that Wootton voluntarily relinquish the dealership.

Despite the apparent intensity and depth of Wootton's belief that the above miscellany comprises significant evidence of the existence of the "scheme" it posits was hatched in or about 1995, as a matter of law, the probative value of this evidence falls far short of suggesting actionable wrongdoing by Subaru. To be sure, there is ample evidence in the record that, at least as early as 1984, and from time-to-time thereafter, Subaru viewed Wootton as a low-performing dealership. Moreover, at least since 1993, and on several occasions thereafter, Subaru forthrightly sought Wootton's voluntary termination of its dealership.[3] In each instance, Wootton declined to terminate its dealership, as was its right under the terms of the various two-year franchise agreements between the parties and, importantly, under state and federal law.

Thus, in the plainest of terms, it has been no secret to Wootton that for nearly a decade, Subaru wished to end its relationship with Wootton. Nonetheless, *Wootton was never terminated as a dealership.* The franchise agreement was again renewed in June 1998, effective as of March 1, 1998, for an additional two-year term. Indeed, even after Wootton instituted this litigation in March 1999, *the franchise agreement was extended voluntarily by the parties.* The extension expired in

December 2000, and Wootton sold the Subaru franchise. Wootton continues to operate a Volkswagen franchise at the Pasadena location.

In view of my earlier rulings in this case, the present task is to determine whether, based on the summary judgment record before me, Wootton has been able to generate in the course of discovery sufficient evidence to create one or more jury questions as to its allegations that Subaru: (1) breached the franchise agreement, which the parties agree is to be interpreted under Maryland law; (2) committed common law fraud (under Maryland law) by inducing Wootton to renew the franchise agreement effective March 1998 through the use of false representations about its intentions; (3) violated (a) the Automobile Dealer's Day In Court Act, 15 U.S.C. §§ 1221–25 (hereinafter "ADDCA"); and/or (b) the state law analogue to that federal statute, Md.Code Ann., Trans. § 15–207(c), (d) and (e)(2). Again, only acts or omissions of Subaru occurring on or after March 1998 may give rise to cognizable claims. Having carefully examined the record, and having had the benefit of extended oral argument and of the clarifications of its contentions provided by Wootton in its post-hearing memoranda, I explain below why Wootton's remaining claims fail as a matter of law.

## II

Of course, the facts, where there is disagreement between the parties, will be

---

**3.** *See, e.g.,* letter dated June 15, 1995, reporting Subaru's decision not to renew the franchise agreement based on deficiencies in sales performance (the parties subsequently negotiated a renewal of their agreement and the notice of nonrenewal was rescinded); letter dated October 21, 1997, indicating that Wootton's sales performance continues to be poor (noting that Wootton must "achieve sales and penetration levels showing immediate and continuing progress or Subaru will be forced

to exercise all legal remedies available including termination of the franchise agreement"); letter dated March 31, 1998, stating "Subaru has a strong case for terminating the franchise agreement based upon the performance of the dealership"; letter dated July 31, 1998, mentioning Wootton's poor performance and stating that Wootton "must sell consistently 15 to 20 Subaru's a month and that renovations of the showroom must begin immediately".

viewed in the light most favorable to Wootton. On the other hand, I must reject Wootton's importunings that I should indulge its profligate reliance on fanciful and unreasonable inferences in assessing whether it has generated evidence sufficient to avoid summary judgment.

### Breach of Contract Claims

The success of Wootton's breach of contract claims hinges on Wootton's ability to point to contract provisions imposing unambiguous duties upon Subaru, which duties Subaru has breached. *Cf. Continental Masonry Co. v. Verdel Construction Co.*, 369 A.2d 566, 569 (Md.1977).[4] Wootton argues broadly that Subaru actively interfered with Wootton's performance by delaying Wootton's receipt of inventory, supplying it with inadequate and undesirable inventory necessary to the achievement of the sales objectives Subaru imposed upon Wootton, withholding information which Wootton had a contractual right to receive from Subaru and through a more general lack of cooperation. None of these contentions is supported by sufficient probative evidence to survive summary judgment.

The franchise agreement between the parties consists of three interrelated documents: (1) a nonexclusive Dealership Agreement ("Agreement"), which expressly incorporates (2) the Subaru Standard Provisions ("Standard Provisions"), which in turn incorporate (3) the Dealer National Operating Standards Manual ("Operating Standards Manual"). Characteristic of most franchise agreements, the one at issue in this case charges the distributor—Subaru—with few clear obligations to dealers. As a result, Wootton relies heavily on the purported existence of implied duties (for example, as discussed below, the implied duty to provide a broad array of information) including the implied duty of good faith.[5] In essence, however, as will be seen, Wootton has asked the court to read terms into the franchise agreement that it wishes it actually contained. Wootton's desire for the court to do this is understandable, if unavailing: the terms of the franchise agree-

---

4. Wootton makes the extraordinary assertion that because certain of its breach of contract claims survived the earlier motions to dismiss, *a fortiori*, those claims should be deemed to survive summary judgment. *See* Wootton's Opposition to Subaru's Motion for Summary Judgment at 10. Wootton actually attached a copy of my earlier opinion in this case as one of its exhibits supporting its opposition to the motion for summary judgment.

5. Under Maryland law, there is an implied duty of good faith and fair dealing in all contracts. *See Parker v. Columbia Bank*, 91 Md.App. 346, 604 A.2d 521, 531 (1992). This duty "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract," but does not require affirmative action not mandated by the contract. *Id., citing Automatic Laundry Serv. v. Demas*, 216 Md. 544, 141 A.2d 497 (1958). Furthermore, this implied duty cannot override or modify specific contractual terms. *Riggs Nat. Bank of Washington, D.C. v. Linch*, 36 F.3d 370, 373 (4th Cir.1994). While this implied duty applies to performance of contractual obligations, Maryland courts "have not explicitly recognized a separate cause of action relating to this duty." *Lofton v. TLC Laser Eye Centers, Inc.*, 2001 WL 121809 *5 (D.Md. Feb.8, 2001), *citing Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 200 A.2d 166, 174 (1964); *see also Abt Assoc., Inc. v. JHPIEGO Corp.*, 104 F.Supp.2d 523, 534 (D.Md.2000)(holding that Maryland does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing); *Baker v. Sun Co.*, 985 F.Supp. 609, 610 (D.Md.1997)(same). Wootton has not been entirely clear about the distinction between the "duty of good faith" recognized under Maryland common law, on the one hand, and the statutory duty of good faith created under federal and state law discussed later in this opinion. Nevertheless, this lack of clarity does not impede resolution of the remaining issues in this case.

ment provide few specifics that the court could enforce in an action for breach of contract.

In particular, there is little in the franchise agreement that speaks to the nature of Subaru's responsibility to deliver cars to dealers. While one can easily infer that Subaru had some responsibility to deliver vehicles in a timely fashion, Wootton has not presented evidence that creates a genuine issue of fact that supports an allegation of breach of this duty.

For its "unobtainable sales objective/unfair allocation of vehicles" claim, Wootton would like me to permit a jury to determine the freestanding inquiry of what level and type of inventory was necessary for it to meet the sales objectives set by Subaru and, further, to assess whether Subaru did everything it could to insure that Wootton achieved its sales objectives. Wootton argues that the "unattainability of [its] sale's objectives, even assuming that the allocation was made pursuant to a uniform model, is purely a factual question and should be resolved by the jury." *See* Wootton's Opposition to Subaru's Motion for Summary Judgment at 13 (hereinafter "Wootton's Opp.").

This facile formulation does not withstand analysis, however. The franchise agreement is largely silent as to Subaru's method of allocating vehicles to dealers. While Subaru does have an obligation to refrain from acting in ways that prevent Wootton from performing the contract, the contract does not require that Subaru provide Wootton with sufficient inventory to meet its sales goals *regardless of other factors* (such as, for example, the overall supply of product allowed by the manufacturer within the region and Wootton's sales history). Nor does the contract (or the implied duty of good faith and fair dealing) require that Subaru provide support to *insure* Wootton's success as a Subaru franchisee. Thus, while the question whether sales goals were attainable or whether cars were delivered or received "late" may represent factual questions, they are not factual questions that are legally relevant in light of what is contained within the four comers of the agreement between the parties, and in light of the fact that Wootton expressly declines to challenge Subaru's general formula for allocating vehicles to its franchisees.[6] Wootton's allegation that it was deprived of inventory is based on its belief (and that of its expert) that it deserved to receive more

6. As Judge Blake has noted, when a dealer does not challenge a distributor's allocation formula, it is difficult to determine whether a manufacturer has allocated vehicles in a manner inconsistent with a franchise agreement or in a way that is legally inequitable under federal or state law, at least without a showing of a dramatic and unexplainable discrepancy in allocation. *Colonial Dodge, Inc. v. Chrysler Corp.*, 11 F.Supp.2d 737, 752 (D.Md. 1996). Such dramatic "shorting" was shown in *David R. McGeorge Car Co., Inc. v. Leyland Motor Sales, Inc.*, 504 F.2d 52, 54 (4th Cir. 1974), and *Jay Edwards, Inc. v. New England Toyota Distributor, Inc.*, 708 F.2d 814, 818 (1st Cir.1983). In each of these cases, however, this "shorting" was accompanied by a wrongful demand or act, such as forcing the acceptance of a dual dealership or penalizing

a dealer for attempting to organize dealers to negotiate with the distributor. This conduct was found to be in violation of federal or corresponding state law, but was not found to constitute a breach of contract. In *Fox Motors, Inc. v. Mazda Distributors, Inc.*, 806 F.2d 953, 960 (10th Cir.1986), the court affirmed a jury verdict in which bad faith was found to infect the distributor's allocation system. Here, too, however, the court found that the allocation system was being used to coerce termination. *Id.* Manifestly, as discussed in detail *infra*, such a situation is not presented here. To the degree that Wootton believes it was "shorted" vehicles, this belief is based upon Wootton's estimates of the vehicles it claims it deserves based on the sales objectives assigned.

cars from Subaru to meet the goals set, not that they were shorted cars based on Subaru's allocation system.

Manifestly, the evidence in the summary judgment record does not support a claim for breach of contract based on a "failure to provide information." To the contrary, the franchise agreement allowed Subaru wide discretion and control over market information. Finally, because Subaru never terminated Wootton as a dealer, it is plain that Wootton has no cognizable breach of contract claim based on an allegation that *threats* of termination were made. A detailed discussion of the sundry breach of contract claims follows.

### *"Delayed Shipments" Claim*

■ One of the most vigorously advanced of Wootton's claims in this case is its largely incoherent contention that Subaru exploited its ostensible control over the timing of periodic deliveries to its franchisees of vehicles to insure that Wootton always received deliveries "late." Summary judgment must be granted to Subaru on this claim for at least two reasons. First, Wootton has not presented substantial evidence to support its claim that vehicles were delivered "late" or that more than a very small percentage of its deliveries was received beyond an "estimated time of arrival," much less substantial evidence of the existence of a deliberate plan and routine practice of delivering vehicles late to Wootton. Second, Wootton has failed to point to any provision of the franchise agreement that mandates delivery times or any other provision that would create a genuine issue of material fact that Subaru violated any contractual undertaking.

The scope of Subaru's obligation to deliver vehicles in accordance with some reasonable time limit is not clearly defined in the franchise agreement. Undoubtedly, however, because compliance with "minimum standards" is "an essential element of Dealer's performance under" the franchise agreement, Subaru had an obligation to deliver vehicles in such a way as not to thwart Wootton's ability to meet "minimum standards." That this is so serves only as a vague guide, however, and does not provide clear criteria by which to judge the timeliness of deliveries. Wootton has not generated evidence sufficient to raise a genuine issue as to whether Subaru was so routinely delinquent in delivering cars to Wootton to be the cause of a failure to meet its contractual duties. *Cf. Junikki Imports, Inc. v. Toyota Motor Co.,* 335 F.Supp. 593 (N.D.Ill.1971).

The principal contract provision addressing delivery is the "exculpatory clause," *see id.* at 596–97, of the "Standard Provisions," section 10.12, which provides as follows in pertinent part:

Failure or delay in Delivery

... [Subaru] shall [not] be liable, or under an obligation whatever, to Dealer or Dealer's customers for failure to deliver under, or for delay in making delivery pursuant to, any purchase orders of Dealer accepted by Distributor if such failure or delay is *due to the fact that delivery or timely delivery was rendered impossible or more burdensome than it would have been in the normal course of business by any cause or event, whether foreseen or unforeseen,* including, solely by way of illustration and not by way of limitation, any cause or event in the nature of force majeure, Act of God, Act of Prince, foreign or civil war, riot, interruption of navigation, shipwreck, strike, lockout, other labor trouble, embargo, blockade, fire, explosion, *delay or failure of ... [Subaru] or any other supplier of [Subaru] to make delivery ... Subaru's ... insufficient inventory of Subaru Products, or Dealer's failure to comply with established ordering procedures.*

Standard Provisions § 10.12 (emphases added).

This provision is very broad. Plainly, it covers all contingencies, foreseen and unforeseen, from acts of God to business mismanagement. Wootton has not marshaled evidence sufficient to demonstrate that Subaru has delivered vehicles in a manner inconsistent with this provision.

In any event, the factual record is plain and undisputed that Subaru has little actual control over the precise timing of deliveries of vehicles to dealers. Subaru contracts with shipping, rail and trucking companies to get vehicles delivered to dealers. Modest delays are not infrequent. Indeed, delays are a source of complaint among many dealers and Subaru itself. Unlike larger manufacturers, Subaru does not have staff at shipping points, which further diminishes its ability to exercise greater control.

Dealers acquire information about the vehicles being shipped to them through so-called "pipeline reports" and printouts detailing inventory and allocation. Pipeline reports are accessed through Subaru's computer system. They provide information to a dealer as to the estimated times of arrival ("ETAs") of the vehicles that have been allocated to it. Dealers are encouraged to sell cars (if they can) off the pipeline reports, but they are forewarned that the stated delivery dates are estimated and subject to change.

To be sure, Subaru can request that a delivery be expedited, or "hot shipped," but this provides no guarantee that the products will arrive significantly faster than normal. Further, that Subaru can request, on a discretionary basis, that vehicles be "hot shipped," does not provide a clear and concrete formula, or system as Wootton argues, by which a timely or late delivery can be judged. Wootton infers from Subaru's ability to "hot ship" cars that it has significant control over delivery and that it has deliberately de-prioritized the delivery of Wootton's cars to prevent its success. This inference is not supported by the evidence in the record.

Wootton does not present any evidence placing delivery time genuinely at issue; it presents only anecdotes and unsupported allegations. For example, Wootton relies on a cryptic handwritten note appearing on a paper copy of an email message as proof that, since a delivery truck driver, thought to be sick, was not in fact sick, that this was an example of Subaru's scheme to delay deliveries. To the contrary, the email lacks probative value altogether as it demonstrates nothing about a contractual obligation or breach thereof relating to delivery schedules.

Wootton provides evidence of approximately 13 examples of cars which were delivered beyond the ETAs as indicated in the pipeline report over a period of two and a half years. Even assuming that Wootton has shown that these 13 cars were delivered "late," a breach of contract claim could not be predicted on such circumstances, given the provisions of the franchise agreement. These 13 examples represent five percent of all cars delivered to Wootton during the relevant period. Subaru argues persuasively that if Wootton lost sales because its salespersons told a prospective buyer that a car would be available on the expected arrival date, such a loss would be due to Wootton's mismanagement, not Subaru's late delivery of vehicles. Thus, Wootton has not been able to provide any specifics regarding late shipment of inventory after March 1998.[7]

7. While some delivery receipts were provided by Wootton prior to the motions hearing held on February 1, 2001, and many were provided in Wootton's supplemental submission after the hearing, it is difficult to tell whether these vehicles arrived "late." Some of these receipts contain only the date Wootton *received* the vehicles, without providing a clear indication of when the vehicle was expected

At bottom, Wootton simply relies on its general manager's assertion (and its own answers to interrogatories, which were in turn based on the general manager's uncorroborated assertions) that vehicles going to Wootton were always delivered late and that no other dealer in the district experienced such delays. Wootton also alleges that several other dealers in the district received deliveries, particularly of the most saleable vehicles and of new models early in the model year, earlier than Wootton on a routine basis. This anecdotal evidence was not provided in response to specific interrogatories propounded by Subaru during discovery. In any event, moreover, it is not sufficient to generate a genuine dispute of material fact as to whether any post-March 1998 breach of contract claims may be sustained on the basis of an allegation that some vehicles were not received when Wootton expected to receive them.[8]

In short, the terms of the franchise agreement place most of the risk of delay in delivery on the franchisee. The "exculpatory clause" is extremely broad, and gives the dealer a procedure for informing the distributor of delays, but provides no standards for how a delay would be addressed. Accordingly, Wootton has gener-

ated insufficient evidence to support this claim and summary judgment shall be granted to Subaru. *Cf. Zarbock v. Chrysler Corp.,* 235 F.Supp. 130, 134 (D.Colo. 1964)(court presented with evidence of more than 100 deliveries that were beyond the average delivery time, but found plausible explanations for each one, stating "if plaintiff were singled out for repeated, excessive, and unexplainable delayed shipments, he might possibly sustain a cause of action under the [Automobile Dealers' Day in Court] Act.").

*"Unobtainable Sales Objectives/Unfair Allocation of Vehicles" Claim*

■ Wootton asserts, again somewhat incoherently, that Subaru breached the franchise agreement by setting unobtainable sales objectives. As presented to this court, however, the actual basis of this claim is that Subaru did not provide Wootton with adequate (and desirable) inventory to meet the sales objectives that were set by Subaru. Specifically, Wootton's theory seems to be that Subaru intentionally deprived it of inventory in a blatant effort to force Wootton to breach the franchise agreement, thereby providing Subaru with "reasonable cause" to terminate Wootton in accordance with the franchise agreement. As with the other of Woot-

---

to arrive. Other receipts contain only a signature indicating that a vehicle was received, with no delivery date shown. In addition, many of the delivery receipts are impossible to read. These receipts are not probative of Wootton's claim that vehicles were delivered in a manner which violated the franchise agreement.

Wootton also asserts that Subaru intentionally delayed a delivery of vehicles during a crucial sales period, Labor Day weekend in 2000. However, a letter to Wootton from Subaru's Regional Sales Manager in June 2000 shows that Subaru informed Wootton in advance that it could not guarantee that Wootton's allocated vehicles would arrive before the Labor Day weekend. Subaru's Motion for Summary Judgment., Ex. 30.

8. Wootton argues baldly, without supporting evidence, that Subaru knew the location of cars in transit to Wootton, but that Subaru deprived Wootton of this information through a policy of "selective non-disclosure of vehicle locations" so that Wootton cold not retrieve the vehicles on its own.

Wootton also contends that it was the only dealer in District 10 whose vehicles were routinely labeled with a code of X30 and X31. Wootton hypothesized that these codes indicated low priority for delivery. The record demonstrates indisputably, however, that these codes refer to the color of accessories installed, and do not refer to dates of delivery. Wootton offers nothing to undermine this representation.

ton's claims, what is presented in this branch of the case is a theory in search of factual support. But there is none.

This inchoate claim is peculiar in the extreme. Even if it were assumed that the sales objectives set by Subaru were unobtainable in some abstract sense, nevertheless, if Subaru did not violate any provision of the agreement requiring that it provide a particular number of vehicles to Wootton, proof that the sales objectives were "unobtainable" would not support a cause of action unless Wootton suffered actual injury (e.g., was terminated or suffered a loss of revenue needed to sustain the dealership, neither of which is even suggested, let alone supported by substantial evidence). *See Junikki Imports, Inc.*, 335 F.Supp. at 595 (court noted that evidence showing defendant distributor intends "purposefully [to] fail[ ] to provide an adequate number of cars needed to finance ... [plaintiff's] dealership" and "to undersupply plaintiff's [minimal] needs" would sustain a claim under ADDCA). If, as Wootton contends, the gravamen of this claim at the time this case was instituted was Subaru's persistent failure to provide adequate and desirable inventory, then one would have expected Wootton to seek preliminary injunctive relief to cure that alleged default. Wootton has never done so, however.

In any event, the franchise agreement provides little guidance regarding Subaru's obligation to provide dealers with inventory. While Subaru is prohibited from acting in ways that tend to sabotage Wootton's ability to perform under the contract, this plainly does not translate into an obligation cast upon Subaru to provide Wootton a sufficient number of cars each month so that Wootton can meet the sales objectives set by Subaru *regardless of Wootton's actual sales performance or the regional supply of product.*

It is undisputed (and well documented in the reported cases) that the allocation systems that most automobile distributors employ make it difficult for a poorly performing dealer, or even a dealer in a minor "slump," to earn more inventory and thereby improve sales performance. This is true because a significant criterion in allocation decisions is past sales. Under such a regime, a dealer that makes few sales for even a couple of months may earn few cars and/or few of the manufacturer/distributor's more desirable cars under an allocation formula and may get stuck with a poor inventory (i.e., an inventory of low-demand vehicles), allowing it few strategies to improve its sales and earn a more attractive or saleable inventory. This "chicken-and-egg" conundrum is noted in the reported cases. *See, e.g., Fox Motors, Inc. v. Mazda Distributors, Inc.*, 806 F.2d 953, 960 (10th Cir.1986)(explaining that a lack of balanced inventory can make it difficult for a dealer to increase sales and earn a more attractive inventory).

While this may seem "unfair" in some sense, it does not violate a franchise agreement unless the terms of the agreement require a contrary result. It is possible, under Subaru's various allocation formulas relevant to this case, for a dealer to be allocated fewer cars than the number of cars assigned as a sales objective. This mostly occurs when regional supply is low and a dealer's sales performance is poor. Thus, a poor-to-marginally-performing dealer will find it difficult to boost sales and acquire a more attractive inventory.

Wootton does not concede that it has performed poorly, and indeed it contends that, given the alleged deprivation of inventory, it has sold a high percentage of its available vehicles. Wootton, in effect, argues that the franchise agreement requires Subaru to provide it with sufficient inventory to meet the sales objectives even

if Wootton does not make sufficient sales to "earn" the requisite inventory under the generally-applicable allocation formula. Subaru argues that it did provide Wootton with sufficient cars to meet its sales objectives, but that Wootton did not make adequate sales to earn the number of cars it desired.

There are 11 Subaru dealerships in District 10. Each dealership is assigned individual sales objectives, and Wootton does not challenge Subaru's right to establish reasonable sales objectives. For example, in 1999, the sales objectives for District 10 dealers ranged from 25 cars per year for the smallest dealership to 390 cars per year for Heritage, the largest. The sales objectives appear to be based on history of sales as well as the location of dealership, size and other demographic factors. Each dealership is treated differently according to these various factors.

After a meeting between the responsible officers of the parties, in May 1998, Wootton's sales objective was established at 15 cars per month for 1998.[9] Wootton denies that it agreed at that meeting to a sales objective of 15 cars per month. Wootton, however, did nothing to challenge Subaru's interpretation of the May 1998 meeting (as set forth in a follow-up letter from Subaru) which indicated that Wootton acknowledged at the meeting that a sales objective of 15 cars per month was reasonable. Wootton acknowledges that it received and read the letter, but makes the altogether implausible contention here that while it did not agree with that particular representation by Subaru, it simply did nothing to refute it. Nor did Wootton follow the

procedures outlined in the franchise agreement to challenge the reasonableness of its sales goals. Accordingly, as a matter of law, I conclude that the 1998 sales objective of 15 cars per month was reasonable and was specifically agreed to be so by Wootton.[10] Wootton actually sold 133 vehicles (an average of 11.08 vehicles per month) in 1998.

Wootton complains broadly that Subaru allocated to it only 134 vehicles for 1998, making it impossible, according to Wootton, for it to meet its sales objectives of 15 cars per month. "A manufacturer's duty toward a dealer is defined initially by its allocation agreement. A dealer is entitled only to the cars due under the allocation system, not to all the automobiles it requests." *Colonial Dodge, Inc. v. Chrysler Corp.*, 11 F.Supp.2d 737, 744 (D.Md.1996); *see also Cabriolet Porsche Audi, Inc. v. American Honda Motor Co.*, 773 F.2d 1193, 1202–04 (11th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1641, 90 L.Ed.2d 186 (1986). Neither state nor federal law provides a formula for allocation. *See Southern Rambler Sales, Inc. v. American Motors Corp.*, 375 F.2d 932, 935 (5th Cir.) *cert. denied*, 389 U.S. 832, 88 S.Ct. 105, 19 L.Ed.2d 92 (1967); *Autohaus Brugger, Inc. v. Saab Motors, Inc.*, 567 F.2d 901, 914 (9th Cir.1978). When the allocation system is not clearly delineated in the agreement, as is the situation here, and the relationship of the allocation formula to sales objectives also is not clearly defined, the dealer has little to point to in claiming that the sales objectives are unobtainable or that the allocation was too low to allow

---

**9.** Wootton also alleges that Subaru *increased* its sales objective to 20 cars a month in the summer of 1998, on the basis of a letter from Subaru which observed that "[i]t is essential for Wootton Subaru to consistently sell between 15 to 20 Subaru's per month." Wootton's Opp., Ex. 22. This argument is specious and will not be further addressed.

**10.** In 1999, Wootton's sales objective was 150 vehicles per year, ranging from 9 to 15 cars per month, with an average of 12 to 13 cars per month. Wootton sold 142 vehicles (an average of 11.83 vehicles per month) in 1999.

the dealer to meet the objectives, short of showing a dramatic change in allocation or dramatic failure to supply vehicles with no reasonable explanation. Wootton has demonstrated neither. *See Cemar, Inc. v. Nissan Motor Corp.*, 713 F.Supp. 725, 735, 736 (D.Del.1989) (interpreting Maryland and federal law)("Cemar fails to identify any particular provision of the [allocation system] or the dealership agreements that it claims Nissan breached in making Cemar's vehicle allocations" or that the dealer was entitled to any cars it considered saleable).[11]

Subaru's allocation process, which has taken several forms over the years, generally takes into account three main factors: (1) how many cars are available to allocate to the dealers in a region; (2) the travel rate of each dealer, i.e., how many cars a dealer has sold in a particular time frame (usually 60 days); and (3) the dealer's current inventory.[12] Subaru's allocation system is not a "turn and earn" system, which would mean that an allocation of vehicles would match the amount of cars sold by the dealer; rather, the system is based on an analysis of inventory and market penetration. Subaru contends that most dealers can sell 15 cars a month if they have 25–30 cars in inventory, i.e., a 60–day supply. *See* Standard Provisions § 11.3 ("Allocation")(stating that "Dealer acknowledges that Subaru Products may not be available to Dealer in sufficient supply from time to time because of production limitations or other factors. It is understood and agreed that Distributor will allocate all affected Subaru Products equitably, *using appropriate factors such as the respective inventory levels and sales performance of Distributor's dealers during a representative period of time immediately prior to such allocation.*" (Emphasis added)).

In 1998, the sales objective for Wootton was 175 vehicles, or 14–15 per month. Subaru contends that in 1998, Wootton's inventory ranged between 36–53 vehicles per month.[13] Wootton contends that it did not have access to that many vehicles for sale. Wootton provides data which only shows the vehicles it had available on the first day of each month. Wootton's Supplemen-

---

**11.** In *Jay Edwards, Inc. v. New England Toyota Distributor, Inc.*, 708 F.2d 814, 818 (1st Cir.), *cert. denied*, 464 U.S. 894, 104 S.Ct. 241, 78 L.Ed.2d 231 (1983), the court affirmed a jury verdict finding a violation of ADDCA and corresponding state law when a "sudden and entirely unexplained" discrepancy in allocation occurred following the dealer's efforts to organize area dealers. No such showing has been made here.

**12.** In *Colonial Dodge, Inc.*, 11 F.Supp.2d at 752, Judge Blake noted the difficulty in asking a court to evaluate the nature of a distributor's allocation responsibility when the formula is not clearly presented by the distributor or laid out in the franchise agreement. She concluded that "[t]he fact finder in the present case has no rational way of discerning whether Dealers' lower percentage of Caravans received during the period in question was a function of the allocation system's reliance on past sales performance, on plaintiff's

ordering practices, or on Chrysler's misallocation of vehicles .... Because there is no rational basis for a fact finder to distinguish between these possibilities, only the third of which creates liability for Chrysler, Dealers fail to carry their burden of production at this stage."

**13.** In 1999, Wootton's sales goal was 12–13 vehicles per month. During that time period, Subaru argues that Wootton's inventory ranged between 24 and 42 cars per month. In the first four months of 2000, Subaru claims that the inventory was respectively, 32, 55, 38, 39. Wootton's challenge of these figures comes largely from its presentation of data that reflects inventory on the first of each month. Overall, the data reveals that Wootton had enough cars to meet its sales objectives, but that it was not making enough sales to earn *additional inventory* over and above its allocation.

tal Memorandum, Exhibits A, 1, and 2 (hereinafter "Wootton's Supp. Mem."). Wootton's data, supplied by general manager, Ron Lane, indicates that Wootton had from nine to 28 vehicles available to it on the first day of each month in 1998. *Id.* Wootton further contends, for example, that in mid-May 1998, it had only 17 cars "on the ground" and was expected to sell 15. Using these decontextualized figures, Wootton claims that its sales objectives were unobtainable. The record belies this purported analysis.

Although Wootton challenges the validity of Subaru's data regarding inventory and allocation, this challenge consists only of attorney argument and not competing factual submissions. Wootton argues that during the relevant period addressed in this litigation it had on average 18.4 vehicles on the ground per day. *See* Wootton's Supp. Mem. at 8. Manifestly, however, if that is the average number of vehicles "on the ground" for Wootton per day, it must be inferred that because Wootton actually sold approximately 11.41 vehicles per month, its monthly average of vehicles was approximately 29.81, or a two month supply. In fact, utilizing Wootton's own data,[14] it appears that on average Wootton carried 30.33 vehicles per month in 1998, 25.5 in 1999, and 38.4 in the first five months of 2000. Wootton's Supp. Mem., Exhibits A, 1, and 2. Over the 29 month period at issue in this case, Wootton's average monthly inventory was 29.75. While on any given day Wootton may have had 18 vehicles "on the ground," this figure does not account for *monthly sales* and inventory that arrives throughout the month. This *monthly average* appears to be generally consistent with the figures

presented by both Wootton and Subaru and tends to prove that Wootton received the very inventory it was arguably entitled to receive under the franchise agreement. *See* Subaru's Motion for Summary Judgment, Ex. 24; Wootton's Opp., Ex. 32. Accordingly, the claim for "unobtainable sales objectives/unfair allocation" fails as a matter of law.

*"Failure to Provide Information" Claim*

■ Wootton claims that the franchise agreement entitled it to receive from Subaru several different types of information. In addition, it contends that the implied duty of good faith and fair dealing requires that this information be provided, based on the belief that failure to provide this information prevents it "from performing under the contract." Wootton's Opp. at 16. Wootton appears to have requested this information primarily to support its contention that the sales objectives established by Subaru were not reasonable.

Specifically, Wootton made a request for, and here argues that Subaru was obligated to provide, the following information: (1) average "inventory turn with respect to sales objectives;" (2) average vehicle profit by model line; (3) average market penetration; (4) the Subaru policy on impossible [sic] sales objectives; (5) the Subaru policy on sales contests that are impossible for a dealer to participate in [sic]; (6) vehicles sold in Wootton's Area of Responsibility in the last five years; (7) Wootton's performance, as compared to other dealers in the region and country; and (8) criteria used by Subaru to assign a "performance objective" to dealers.

---

**14.** This calculation considers not only the vehicles available to Wootton on the first day of the month, but also the vehicles it received during the month. *See* Wootton's Supp. Mem., Exhibits A, 1, and 2. As discussed above, utilizing the reported amount of inventory for *one day* of each month, even if that one day is the first of the month, does not provide a monthly or daily average of inventory available.

A large portion of the information mentioned above was made available to Wootton, was easily accessible to it or the mode of obtaining such information was detailed in the franchise agreement. The "Standard Provisions" provide guidance with respect to (4) and (5). All directives given by Subaru are assumed reasonable unless the dealer notifies Subaru in writing, providing some evidence supporting the challenge. *See* Standard Provisions § 4.3. Thus, the franchise agreement provides Subaru's policy with respect to the reasonableness of sales objective or sales contests.

Wootton also requested information as to the number of Subaru vehicles sold in its area of responsibility in the last five years. This, by definition, is "Units in Operation." Standard Provision § 2.13. At the time of the execution of the franchise agreement, effective in March 1998, the Units in Operation was 618. Agreement § 15. In addition, this is information readily accessible to Wootton, i.e., the number of registrations for particular makes of cars is available through the state Department of Motor Vehicles.

Next, Wootton complains that it was not provided with the information detailed in the market studies it obtained during discovery in this case. Wootton believed that the demographics of its market area had changed and that proper data would require a revision of the market penetration levels for the area, thus affecting the minimum standards assigned to Wootton. Wootton contends that access to the 1995 and 1999 market studies would have helped it more effectively advertise, with the goal of improving sales.

While Wootton may have benefitted from having access to the market studies, there is nothing in the franchise agreement that provides it with such access. Further, the implied duty of good faith does not obligate Subaru to act in ways that enhance Wootton's performance of the contract.

The franchise agreement between Subaru and Wootton provides little contractual ground for any entitlement of Wootton to information from Subaru. The franchise agreement affirms *Subaru's entitlement* to revise dealers' sales objectives as well as the number, location, and sizes of dealerships based upon their own market studies or review of any other information deemed relevant. *See* Standard Provisions § 18.4 ("Representation Plan").[15] If a change is

---

15. This provision states that

Distributor reserves the right to determine, from time to time, in its best judgment, the numbers, locations and sizes of authorized dealers necessary for proper and satisfactory sales and service representation for Subaru Products. In making such determinations, Distributor will from time to time conduct, to the extent deemed adequate by the Distributor and subject to the ready availability of information, study of the Area of Responsibility and its surroundings, including such factors as geographic characteristics, consumer shopping habits, competitive automobile make representation patterns, sales and service requirements, convenience of customers and past and future growth and other trends in marketing conditions, population, income, Subaru units in operation, Subaru sales and registrations and competitive make registrations. *After making such a determination, Distributor will notify Dealer of any proposed change in Distributor's market representation plan for the Area of Responsibility. If Distributor's market representation plan does not provide for the long term continuation of representation of Subaru Products at the current location of Dealer's facilities and Dealer is so notified, Dealer may continue its operations at that location under and subject to the Agreement and any renewals thereof which may be entered into;* however, Distributor shall not be under any obligation to consent to any Significant Change of Ownership Interest at that location.

Standard Provisions § 18.4.

to be made in the "Representation Plan," Subaru "will notify" the dealer of that change. *Id.* The record reveals that, as a matter of law, the market studies represented recommendations, but no official "determination" was made with respect to market representation. Nevertheless, even if such a determination had been made, there is no indication that the franchise agreement entitled Wootton to view the market study upon which that determination was based.

Subaru correctly argues that the only information that it is obligated to share with dealers is information concerning the determination of the dealer's Area of Responsibility. Section Four of the Dealership Agreement states that:

> Dealer's responsibility for the Area of Responsibility shall be determined from time to time on a proportionate basis by Distributor after reviewing in consultation with Dealer relevant statistics and available information concerning the population size, demographics, consumer shopping habits, traffic patterns, and other geographic factors applicable to the Area of Responsibility.

Agreement § 4. Subaru correctly argues that this provision does not create any obligation that Subaru provide information regarding the determination of *sales objectives or minimum standards.* The franchise agreement only contemplates that the dealer might have potential access to information in the determination of the Area of Responsibility, which Subaru deems as one factor in determining minimum standards. This provision states that the Distributor can re-evaluate a dealer's responsibility for an Area of Responsibility, but does not give the dealer any right to demand that a change be made. This provision does not create a guarantee for the dealer to have access to "relevant statistics and available information ..." whenever it is in the possession of the Distributor. Even reading generously the duty to bargain in good faith and the term "in consultation" does not produce any contractual obligation to provide Wootton with the information that was contained in the market study.

To be sure, the franchise agreement does require that the planning volume be established "in consultation" with the dealer. *See* Standard Provisions § 8.3. But as with the other provisions referring to the establishment of standards and objectives, the criteria used to establish those figures are largely at the discretion of the distributor, Subaru. Planning volume is to be established by the distributor, in consultation with the dealer, but the provision of information is not included in this process. Although Wootton contemplates an active involvement in these decisions by virtue of the expression "in consultation," that is not a reasonable interpretation of the language relied upon.

Because Wootton has not pointed to provisions of the agreement that establish that Subaru has a contractual or implied obligation to provide the information it requests, summary judgment must be granted to Subaru on this claim.

### *"Threats of Termination" Claim*

■ Wootton alleges that Subaru violated its duty of good faith and fair dealing by repeatedly threatening to terminate the dealership. Indisputably, Subaru can only terminate or refuse to renew a dealership for cause. Equally indisputably, Wootton was never terminated. From the period of consideration, March 1998 until the present, Wootton presents little evidence to support this claim.

Subaru does not deny that it has discussed voluntary termination and has even indicated that, based on its assessment of Wootton's poor performance, it believed it had grounds to terminate for cause. Such a statement does not constitute a prohibit-

ed threat. It does not violate the dealership agreement or the duty of good faith and fair dealing for Subaru to request that Wootton voluntarily relinquish the dealership or even mention the possibility of initiating termination if Subaru has cause to do so. Subaru made no attempt to hide its dissatisfaction with Wootton's performance and openly admitted through the proposed addenda to the 1998 franchise renewal that renewal was occurring in spite of this poor performance and its belief that Wootton was technically in breach of its obligations.[16]

Wootton's claim relies on its belief that it was performing well as a dealer, either based on objective criteria, which it alleges Subaru misrepresented, or in relative terms, given Subaru's alleged deprivation of inventory to Wootton (i.e., it sold a high percentage of its meager inventory). Nevertheless, even accepting Wootton's account of "threats of termination" as true, such threats do not constitute prohibited threats that violate a contractual provision or the duty of good faith.[17]

### Fraud in the Inducement Claim

■ Under Maryland law, a claim for fraud in the inducement consists of "the fraudulent intent of the promisor, the false representation of an existing intention to perform where such intent is in fact nonexistent, and the deception of the promisee by such false promise." *Tufts v. Poore*, 219 Md. 1, 147 A.2d 717 (1959). To sustain such a claim a plaintiff must allege and prove: (1) that the defendant made a false

statement of material fact to the plaintiff; (2) that its falsity was either known to the defendant or the representation of fact was made with reckless indifference as to its truth; (3) that the misrepresentation of fact was made for the purpose of defrauding the plaintiff; (4) that the plaintiff relied upon the misrepresentation and had the right to rely on it; and (5) that the plaintiff suffered compensable injury from the misrepresentation. *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 715 A.2d 188, 193 (1998), *citing Nails v. S & R*, 334 Md. 398, 639 A.2d 660, 668 (1994).

This claim arises out of the representations made by Subaru officials at the meeting between Wootton and Subaru officials at the Southeast Regional Office on May 12, 1998, memorialized in the letter of May 13, 1998. Wootton also alleges that a "failure-to-disclose" misrepresentation occurred when Subaru failed to divulge information from the 1995 market study. The theory seems to be that by failing to disclose to Wootton the information in the market study, Wootton was induced to renew the franchise agreement without knowing that Subaru had plans for the eventual termination of the franchise.

■ Wootton argues that it reasonably relied on the following promises made at the May 12th meeting (as reiterated in the follow-up letter dated May 13, 1998):(1) that Subaru would provide it with a minimum of five "incremental units from the next allocation market action pool [sic] *to ensure* [Wootton's] *availability going for-*

---

16. Indeed, Subaru proposed and Wootton rejected several addenda to the March 1998 franchise agreement stating, *inter alia*, that Wootton was not meeting minimum standards in terms of capitalization and sales performance. The addenda stated that Subaru agreed to renew the franchise agreement despite these shortcomings.

17. Wootton has also argued that Subaru breached the franchise agreement by falsely

representing that Wootton's market penetration was low in comparison to other Subaru dealers in District 10. There was little evidence presented to support this allegation. Moreover, were Subaru to have made such a misrepresentation, it would not support an actionable contractual breach, not least because Subaru did not sanction or terminate Wootton as a dealer on this (or any) basis.

ward is sufficient to sell 15 units per month;" (2) that "[Wootton] ha[d] gone on record as stating that [Wootton] understand[s] that [its] current inventory does provide [it] with [the necessary inventory to sell 15 cars per month];" and (3) that "the task [for Wootton being] to sell at a minimum of 15 units per month[, . . . Subaru] *will put [Wootton] in a position to accomplish that task [ . . . although]* [t]he ultimate success of that accomplishment is in [Wootton's] hands." (emphases added). Finally, Wootton asserts that Subaru asked during the meeting that Wootton compile a "wish list" of vehicles that it would like to receive, but that Subaru never intended to respond to the request.

Wootton contends that, in reliance upon these (and other) representations, it renewed the franchise agreement and made commensurate commitments of capital, resources, personnel and facility upgrades. Wootton's contention is that without the commitment of increased allocation of vehicles and marketing support, it would not have renewed the franchise agreement because the sales objectives (which, it will be recalled, Wootton claims it never agreed to in the first place) were too high given its inventory and the allocation formula (which, it will be recalled, Wootton does not challenge). By defaulting on these representations, Wootton contends, Subaru set it up for failure so that there would exist a "for cause" justification for terminating Wootton's franchise or so that it could be pressured into voluntarily relinquishing the franchise.

The fraud claim fails for several reasons. First, the record shows indisputably that Subaru performed the *concrete promises* it made to Wootton, such as completing the installation of a sign and providing five extra vehicles in the next inventory allocation.

Second, what Wootton really seeks by this claim is enforcement of Subaru's rep-resentation that it would put Wootton in the position to meet its sales goals. Even assuming, however, that such a vague promise is (1) a statement of fact and if so, (2) could be enforced, as Wootton signed a franchise agreement after this meeting having a comprehensive merger clause (*See* Standard Provisions § 18.7: "The Subaru Dealership Agreement, these Standard Provisions and the documents referred to or incorporated by reference therein contain the *entire* understanding between the parties. No representations or statements other than those expressly set forth therein or herein were made or relied upon in entering into the Agreement.") but did not contain the representations made on May 12, 1998, Wootton cannot argue that it *reasonably* relied on the statements made in the letter or during the meeting. To the extent that any actionable statements or enforceable promises were made at this meeting or in this letter, these statements and promises were superceded by the fully integrated franchise agreement signed by Wootton on June 19, 1998. The franchise agreement signed by Wootton makes clear that Subaru is obligated to perform only those undertakings set forth within its four corners. As a matter of law, it was not reasonable for Wootton (or any dealer) to assume otherwise.

Particularly because Wootton found Subaru's statement that it would put Wootton in the position to meet its sales objectives so important to its decision to renew the franchise agreement, and because (it now asserts) it understood that statement or promise as an unequivocal commitment of an increased allocation of desirable vehicles, it would have been unreasonable for Wootton to fail to insist that such a commitment be written into the franchise agreement.

Wootton contends that it acted reasonably in relying upon the representations

made at the May 1998 meeting because it was dealing with new management at Subaru and Wootton believed that it had corrected Subaru's alleged misapprehension of Wootton's past sales performance. This claim, however, is fatally undermined by the very presence of the proposed addenda (which Wootton refused to execute) to the renewed franchise agreement signed in June 1998.[18] The addenda made clear that Subaru believed Wootton was performing poorly in several respects, making it unreasonable, as a matter of law, for Wootton to believe that Subaru had changed its longstanding tune regarding Wootton. Wootton, a franchisee for over 20 years, signed the 1998 franchise agreement at its peril and cannot now plausibly claim that it was induced to sign based upon representations clearly excluded by the written terms of the franchise agreement.

Finally, while a claim of fraud in the inducement can be based on an omission, a duty to provide information must exist before a claim based on failure to disclose can be stated. As Wootton has failed to generate a genuine dispute of material fact as to whether Subaru had a contractual or implied duty to divulge the information contained in the 1995 market study to Wootton, the fraud claim cannot stand based on this omission. For all of these reasons, judgment must be entered for Subaru on this claim.

### Automobile Dealers Day in Court Act Claim

■ The Automobile Dealers Day in Court Act was enacted:

for the very purpose of preventing distributors and manufacturers from relying on their adhesion contracts and using bad faith in coercing dealers out of their franchises. It was to somewhat equalize the gross inequity in bargaining power that existed between dealers and manufacturers and to provide some safeguards from the disenfranchisement powers of distributors that the Act was legislated.

*Junikki Imports, Inc.,* 335 F.Supp. at 595. Nevertheless, the "[t]he question for decision is not whether [a distributor] acted unfairly or inequitably in its business relations with the [franchisee]; the narrow question is whether the [distributor] failed to act in 'good faith' as that term is defined in the Act." *Globe Motors, Inc. v. Studebaker–Packard Corp.,* 328 F.2d 645, 648 (3rd Cir.1964). "The duty of good faith requires that manufacturers and distributors comply with the terms of their franchise agreements in a manner not calculated to force individual dealers out of business." *Junikki Imports, Inc.,* 335 F.Supp. at 595. Whether there is coercion depends on an analysis of the defendant's conduct, not the dealer's perception of the same. *See Wallace Motor Sales, Inc. v. American Motors Sales Corp.,* 780 F.2d 1049,1056 (1st Cir.1985)(stating that "the mere fact that a dealer may have felt it had been coerced or intimidated is not sufficient"). It is only when wrongful or discriminatory treatment "is attended by a factually provable motive to compel a dealer to accept a condition which, in effect, would modify the provisions of its contract,

---

**18.** As previously discussed, by 1998, Subaru had sought repeatedly to make clear that it believed it had several legitimate reasons for nonrenewal of the franchise agreement. While Wootton insists that it was performing adequately, Subaru clearly believed the contrary. Under these circumstances, Subaru would hardly have had any motivation to act fraudulently to induce Wootton to renew the contract so it could turn around and sabotage Wootton by manufacturing a reason to terminate the franchise. It does not appear that Subaru had to manufacture a reason for termination or non-renewal, but Subaru is not to be criticized for taking a cautious approach.

that such action may constitute culpable coercion which the statute proscribes." *Ed Houser Enters., Inc. v. General Motors, Corp.*, 1976 WL 1245 *8 (S.D.Ill. April 16, 1976).

■ The Fourth Circuit has stated that a lack of good faith under ADDCA means "more than mere unfairness, and must be determined in the context of actual or threatened coercion or intimidation." *David R. McGeorge Car Co. v. Leyland Motor Sales, Inc.*, 504 F.2d 52, 55–56 (4th Cir.1974)(internal quotations omitted). Coercion or intimidation must include a wrongful demand accompanied by the threat of sanctions for noncompliance. *See Colonial Dodge, Inc.*, 11 F.Supp.2d at 743. However,

> a breach of contract is not a pre-requisite to showing 'lack of good faith.' Threats and coercion may be subtle. But the cases clearly establish that the burden of proving bad faith is a high one under the Act. Each detrimental action taken by the manufacturer against the dealer should be considered in assessing bad faith. It seems, however, the sum total of actions must fit together into some consistent pattern which may be construed as outright, or implied, coercion or intimidation.

*Zarbock*, 235 F.Supp. at 134 (citation omitted).

While the ADDCA did attempt to equalize power between dealers and distributors, there have been few cases in which dealers have actually prevailed. As one court has said, the "ways and wiles of big business may indeed seem harsh, but this Act does not purport to provide a remedy against uniformly distasteful national practices by automobile manufacturers to their dealers." *Id.* The ADDCA states that "recommendation, endorsement, exposi-

tion, persuasion, urging or argument shall not be deemed to constitute a lack of good faith." 15 U.S.C.A. § 1221(e). Further, the "act allows for the termination of inefficient dealers, the use of persuasion in seeking voluntary termination, and the addition of new dealers to exploit fully a particular market." *Randy's Studebaker Sales, Inc. v. Nissan Motor Corp.*, 533 F.2d 510, 515 (10th Cir.1976).

■ For Wootton to establish this claim it must project evidence of a wrongful demand or act, constituting coercion, that carries with it a sanction for noncompliance. Wootton must show a causal connection between coercion and some act by Wootton it would otherwise avoid.[19] *Brugger*, 567 F.2d at 913. Wootton argues here that the wrongful demand or act was the setting of sales objectives that were unobtainable coupled with the threat of termination if those objectives were not achieved. As the discussion above shows, however, Wootton presents no facts to support the contention that the sales objectives set by Subaru were unobtainable or otherwise established in anything other than good faith, that Subaru had a contractual obligation to supply it with the inventory Wootton felt was appropriate, or that termination was threatened in a prohibited manner. Thus, Wootton lacks evidence of a wrongful demand. Thus, even if Subaru threatened termination, such threats were not causally related to any wrongful act or demand.

Wootton cites *Brugger* to support its ADDCA claim. It is indeed "true that a violation of the Act may occur when a manufacturer sets an unrealistic goal (which *none* of its dealers can meet) and then selectively terminates one dealer for failing to meet that goal." *Brugger*, 567

---

19. For example, the Fourth Circuit found bad faith upon proof that a distributor substantially reduced a dealer's allocation with the pur- pose of compelling the dealer to accept another brand of car. *David R. McGeorge Car Co., Inc.*, 504 F.2d at 55.

F.2d at 912, *citing Madsen v. Chrysler Corp.*, 261 F.Supp. 488, 506 (N.D.Ill.1966) (emphasis added). Plainly, however, such a scenario is not presented in this case. Here, there is no evidence that the distributor used sales objectives to coerce the dealer. Because Wootton has not provided sufficient facts to create a genuine issue regarding the setting of unobtainable goals or that termination was unjustifiably threatened or carried out, summary judgment must be granted to Subaru on this claim.

### Maryland Statutory Claims

The Maryland Transportation Code mirrors ADDCA to a large degree, but provides some additional guarantees.[20] The statute provides as follows in pertinent part:

(c) Delivery of vehicles, equipment, etc.—A manufacturer, distributor, or factory branch, whether directly or through an agent, employee, or representative, may not coerce any dealer to order or accept delivery of any vehicle, any equipment, parts or accessories for a vehicle, or any other commodity that is not required by law or by the dealer's franchise or that was not ordered voluntarily by the dealer.

(d) Franchise agreements.—A manufacturer, distributor, or factory branch, whether directly or through an agent, employee, or representative, may not require or coerce a dealer, by franchise agreement or otherwise, or as a condition to the renewal or continuation of a franchise agreement, to:

(1) Eliminate from the use of the dealer's facilities a dealership for which the dealer had a franchise agreement to utilize the facilities as of March 1, 1996; or

(2) Materially change the dealer's facilities or method of conducting business if the change would impose substantial financial hardship on the business of the dealer.

(e) Performance standards.—(1) A manufacturer, distributor, or factory branch, whether directly or through an agent, employee, or representative, may not require or coerce a dealer to adhere to performance standards that are not applied uniformly to other similarly situated dealers.

(2) A performance standard or program for measuring dealership performance that may have a material effect on a dealer and the application of the standard or program by a manufacturer, distributor, or factory branch shall be fair, reasonable, equitable, and based on accurate information.

Md.Code Ann., Transp. § 15–207.

As Wootton has failed to survive summary judgment on the claims arising from the setting of unobtainable goals and threats of termination based on Wootton's failure to meet those goals, Subaru is entitled to summary judgment as to the state claims as well.

### III

For the reasons set forth above, and for the reasons stated in my prior oral and written opinions in this case, the defen-

---

**20.** "In order for coercion to exist within the meaning of this definition, the manufacturer must specifically undertake to change the dealer's conduct." *Antwerpen Dodge, Ltd. v. Herb Gordon Auto World, Inc.*, 117 Md.App. 290, 699 A.2d 1209, 1219 (1997). Similar to the meaning of coercion in the federal act, there must be a demand, accompanied by a threat of sanctions for noncompliance. *Id.* See also *Colonial Dodge, Inc.*, 11 F.Supp.2d at 744 (stating that the same analysis applies to the state and federal acts with respect to the meaning of coercion).

dant's motion for summary judgment shall be granted.